In the Matter of the CELOTEX CORPORATION, et al., Debtors.

The CELOTEX CORPORATION, et al., Plaintiff,

v.

AIU INSURANCE COMPANY, et al., Defendants.

Bankruptcy Nos. 90–10016–8B1, 90–10017–8B1.
Adv. No. 91–40.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

June 7, 1996.

Jeffrey W. Warren, Bush, Ross, Gardner, Warren & Rudy, P.A., Tampa, FL, for debtors.

Charles P. Schropp, William R. Daniel, Schropp, Buell & Elligett, P.A., Tampa, FL, Deborah A. Swindells, Karen L. Bush, Nicholas J. Zoogman, Anderson, Kill, Olick & Oshinsky, Washington, DC, Stephen A. Madva, Montgomery McCracken Walker & Rhoads, Philadelphia, PA, Bruce Bishop, Willcox & Savage, Norfolk, VA, George N. Wood, Vice President and General Counsel, Tampa, FL, for plaintiffs.

Sara Kistler, Assistant United States Trustee, Tampa, FL.

John W. Kozyak, Kozyak Tropin Throckmorton & Humphreys, P.A., Miami, FL, for Asbestos Property Damage Claimants Committee.

Charles M. Tatelbaum, Johnson, Blakely, Pope, Boker, Ruppel & Burns, P.A., Clearwater, FL, for Unsecured Trade Creditors Committee.

William Knight Zewadski, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, FL, for Unofficial Asbestos Health Claim Co–Defendants Committee.

H.C. Goplerud, Honigman Miller Schwartz and Cohn, Tampa, FL, Sheldon S. Toll, Honigman Miller Schwartz & Cohn, Detroit, MI, for Asbestos Health Claimants Committee.

Daniel C. Sauls, John Flyger, Steptoe & Johnson Company, Washington, DC, for Highlands Insurance Co.; Old Republic Insurance Company.

Robert J. Bates, Jr., Maryann C. Hayes, Stanley V. Figura, Bates Meckler Bugler & Tilson, Chicago, IL, for Eric Reinsurance Company.

Deborah M. Paris, Paris & Associates, Tampa, FL, for Certain Underwriters at Lloyd's of London (Plaisted).

John A. Yanchunis, Blasingame Forizs & Smiljanich, St. Petersburg, FL, for Transportation Insurance Company, Continental Casualty Company, Columbia Casualty Company, Eric Reinsurance Company and Zurich American Insurance Company.

David C. McLauchlan, Andrew Kochanowski, Lord Bissell & Brook, Chicago, IL, for Certain Underwriters at Lloyds of London.

Thomas B. Keegan, Robins, Kaplan, Miller & Ciresi, Chicago, IL, for Employers Mutual Casualty Company.

William Clearly, Mendes & Mount, New York City, for Barrett and London Market Companies.

Gregory J. Willis, Bart Billbrough, Walton Lantaff Schroeder & Carson, Miami, FL, for Florida Insurance Guaranty Association, Inc.

W. Gray Dunlap, Jr., Tampa, FL, for Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company.

Rolph Gilbertson, Zeele & Larson, Minneapolis, MN, for Employers Insurance of Wausau.

Margaret Jones, Grippo & Eldon, Chicago, IL, for American Insurance Company and National Surety Corporation.

Thomas B. Mimms, Jr., MacFarlane Ferguson, Tampa, FL, for American Home Assurance Company, AIU Insurance Company, Highlands Insurance Company, Old Republic Insurance Company, Granite State Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA., Employers Mutual Casualty Company, American Insurance Company, National Surety Company, St. Paul Surplus Lines Insurance Company.

Christine A. Nykiel, Jackson & Cambell, Washington, DC, for American Home Assurance Company, AIU Insurance Company, Granite State Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA.

Elizabeth G. Repaal, Harris Barrett, Mann & Dew, Tampa, FL, for Northbrook, as successor in interest to Allstate Insurance Company.

Mary A. Lau, Lau Lane Pieper Conley & McCreadie, P.A., Tampa, FL, for Employers Insurance Company of Wausau.

Elizabeth B. Sandza, Cynthia T. Andreason, Leboeuf Lamb Greene & Macrae, Washington, DC, for Hudson Insurance Company and Gibraltar Casualty Company.

William S. Daskam, IV, Butler Burnette & Pappas, Tampa, FL, for Continental Insurance Company.

Rick Dalan, Clearwater, FL, for Royal Indemnity Company.

Jeffrey A. Aman, Aman & Lins, Tampa, FL, for Insurance Company of North America and California Union Insurance Company.

## MEMORANDUM OPINION

THOMAS E. BAYNES, Jr., Bankruptcy Judge.

### I. INTRODUCTION

This cause came on for final evidentiary hearing upon the adversary proceeding filed by Celotex Corporation and Carey Canada, Inc., (collectively referred to hereinafter as Debtor). Debtor seeks a declaratory judgment as to the insurance coverage under numerous insurance policies purchased by Debtor for: 1) asbestos property damage;[1] 2) asbestos bodily injury; or 3) environmental damage.

On January 13, 1993, this Court entered an order severing this adversary proceeding into four separate phases. Phase one ("Phase I"), the subject of this order, ad-

---

1. The use of the term "property damage" throughout this opinion should not be confused with the defined term "Property Damage" as provided for in the insurance policies at issue. The use of the term "property damage" when not capitalized means damage to property in the general sense which is not necessarily a risk covered under the insurance policies at issue. Use of the term "Property Damage," when capitalized, refers to "physical injury to tangible property."

dresses the issue of insurance coverage for property damage claims. Phase two addresses insurance coverage for bodily injury claims, Phase three addresses coverage for environmental claims, and Phase four addresses policy-specific issues.

In Phase I of this adversary proceeding, it is Debtor's position the mere presence of asbestos in a building constitutes Property Damage as that term is defined in the insurance policies and as such is a covered risk under those policies. The insurance companies [2] (collectively referred to hereinafter as Defendants) take the contrary position and assert the mere presence of asbestos in a building does not constitute "Property Damage" as that term is defined in the insurance policies and is therefore not a covered risk.

During the more than 50 days of trial of Phase I of this adversary, this Court heard the testimony of lay and expert witnesses, admitted or identified into evidence over 800 exhibits, and viewed numerous demonstrative exhibits including 4 videotaped demonstra-

tions. Having considered this evidence and the record, the Court makes the following findings.

The Defendants in this adversary are various insurance companies which, over approximately 30 years, sold insurance policies to Debtor. Debtor is the insured under these policies by virtue of acquisitions and/or mergers with other entities throughout its corporate history.[3] The policies sold to Debtor by Defendants, and at issue in this trial, are umbrella and excess policies.[4]

Debtor's involvement with asbestos and asbestos-containing materials (ACM) began at various points in its corporate history. Debtor's complex corporate family tree is illustrated in detail in the chart attached as Appendix A to this opinion.[5] As a result of the various mergers and acquisitions of these companies, Debtor acquired the liabilities associated with asbestos-related claims against those companies. Debtor, its acquired companies, and its corporate predecessors, mined

---

2. The defendants subject to this Order are as follows:
 1) AIU Insurance Company
 2) American Home Assurance Company
 3) The American Insurance Company
 4) California Union Insurance Company, now known as CIGNA Specialty Insurance Company
 5) Columbia Casualty Company
 6) Continental Casualty Company
 7) Continental Insurance Company
 8) Employers Insurance of Wausau, a Mutual Company
 9) Employers Mutual Casualty Company
 10) Eric Reinsurance Company (as successor to American Excess Insurance Company)
 11) Federal Insurance Company
 12) First State Insurance Company
 13) Florida Insurance Guaranty Association, Incorporated, a non-profit corporation, (FIGA is statutory successor to 3 insurance companies that have been declared insolvent and are in the process of being liquidated—Integrity Insurance Company, Midland Insurance Company, and Transit Casualty Company)
 14) Granite State Insurance Company
 15) Hartford Accident and Indemnity Company
 16) Highlands Insurance Company
 17) Insurance Company of North America
 18) Lexington Insurance Company
 19) National Surety Corporation
 20) National Union Fire Insurance Company of Pittsburgh, Pennsylvania
 21) Old Republic Insurance Company
 22) The Protective National Insurance Company of Omaha [in Rehabilitation]
 23) Royal Indemnity Company
 24) Transportation Insurance Company
 25) Twin City Fire Insurance Company
 Also subject to this order are the following defendants which are foreign entities:
 26) Kenneth Robert Barrett, for himself and Certain Underwriters at Lloyd's, London and London Market Companies, respectively, individuals, all or most of whom are residents and subjects of the United Kingdom, and/or corporations, all or most of which are organized and existing under the laws of the United Kingdom.
 27) Patrick Selwyn Plaisted, for himself and Certain Underwriters at Lloyd's, London and London Market Companies, respectively, individuals, all or most of whom are residents and subjects of the United Kingdom, and/or corporations, all or most of which are organized and existing under the laws of the United Kingdom.
 28) Zurich Insurance Company, a corporation organized under the laws of Switzerland.

3. *See infra* App. A for a chart detailing various mergers and acquisitions of companies which comprise the two debtor entities.

4. *See infra* Sect. IV, para. A. for a more complete discussion of the types of policies at issue in this trial.

5. *See infra* App. A; Debtor's Ex. 331.

asbestos and manufactured ACM. Debtor sold the asbestos and the ACM throughout the U.S. and Canada. Subsequently, thousands of lawsuits were filed against Debtor alleging liability associated with the use of products containing asbestos. As a result of these pending actions, on October 12, 1990, Debtor filed for protection under Chapter 11 of the United States Bankruptcy Code.

In Phase I of this adversary proceeding the issue to be determined by this Court is whether Debtor, under policies sold by Defendants, has insurance coverage for asbestos related property damage claims made by third parties. This Court does not rule at this juncture whether Debtor is in fact liable for any claims associated with the asbestos property damage claims, or any other claims filed against Debtor.

## II. PROCEDURAL BACKGROUND

On March 3, 1993, this Court entered an order establishing the procedures under which Phase I of the adversary would be conducted.[6] As set forth in the order, Debtor is required to select up to 8 cases representative of the type of actions alleging liability of Debtor in connection with asbestos and ACM it had sold. To accomplish this, Debtor put on evidence representative of the evidence used against Debtor by typical building owner claimants in underlying actions. Ironically, this required Debtor to reverse its typical adversarial role. Debtor now presents evidence in its case in chief which normally it would defend against. However, Debtor is not required to prove its own liability. Furthermore, this Court's findings, based on the evidence presented, are not a basis for establishing liability for any asbestos property damage claim.

The procedure established sought to avoid the herculean task of determining on a claim by claim basis whether insurance coverage is available to Debtor under its numerous insurance policies.[7] Using its representative cases, it is Debtor's burden to establish it is entitled to coverage for property damage sustained by potential third party claimants. Through its representative cases Debtor is required to show property damage did occur and it is within the range of risks covered by the insurance policies. Further, Debtor must show when the property damage occurred so as to ascertain whether insurance coverage was triggered. By using this process, the Court will establish a standard of policy interpretation to assist all parties in the bankruptcy claims process whereby it can be determined whether any property damage claim is covered by insurance.

The following are the representative cases selected by the Debtor:

### 1. The Federal Reserve Bank [8]

The Federal Reserve Bank located in Minneapolis, Minnesota alleged property damage to the building resulting from a spray-applied fireproofing product called "Firebar".

### 2. The Adams Arapahoe School District [9]

The Adams Arapahoe School District, a Colorado school district alleged property damage to various school buildings resulting from several asbestos-containing products, including a product called "Aircell".

### 3. The Kansas City Airport [10]

The Kansas City Airport facility alleged property damage stemming from a spray-

---

**6.** *Celotex Corp. v. AIU Insurance Co., et al. (In re Celotex Corp.),* 152 B.R. 661, 665 (Bankr. M.D.Fla.1993).

**7.** On the date Debtor filed its voluntary petition approximately 119 property damage claims were pending in various stages of litigation against Debtor. The property damage claims implicate hundreds of thousands of buildings. (*See* Phase I Tr. at p. 513.) On the claims bar date for property damage claims, approximately 800 property damage claims totaling almost 20 billion dollars were filed against the Debtor.

**8.** *See* Compl. filed in Fed. Reserve Bank v. Carey–Canada, Inc. (D.Minn. filed March 4, 1986). (Debtor's Ex. 872 at 1).

**9.** *See* Compl. filed in Adams–Arapahoe Sch. Dist. No. 28–J v. Celotex Corp. (D.Colo.). (Debtor's Ex. 801 at 1).

**10.** *See* Debtor's Ex. 890 at 1 (showing caption page for Kansas City v. W.R. Grace & Co., No. CV86–19615 (Mo.Cir.Ct.Jackson County filed August 12, 1986)).

applied surface treatment which contained chrysotile asbestos mined by Debtor.

### 4. The Maryland State Buildings [11]

Various state buildings alleged property damage resulted from a variety of asbestos-containing materials including, pipe covering, ceiling tile and a spray-applied fireproofing material known as "Spraycraft".

### 5. Fairfax County [12]

Numerous general services government buildings owned and located in Fairfax County, Virginia alleged property damage caused by asbestos-containing fireproofing and surface materials manufactured by Debtor.

### 6. The Massillon Geriatric Center for the Living [13]

The Massillon Geriatric Center for the Living, a state mental health hospital, alleged property damage to the hospital caused by spray-applied material containing asbestos manufactured by Debtor.

### 7. The Archdiocese of St. Louis [14]

The Archdiocese of St. Louis is the owner of the largest school district in the state of Missouri as well as other buildings, including hospitals, churches and residences. The Archdiocese alleged property damage to its buildings caused by asbestos-containing ceiling tiles, sprayed-applied material and pipe and boiler insulation products manufactured by Debtor.

### 8. St. Joseph's Hospital [15]

St. Joseph's Hospital is a small privately owned hospital located in Georgia. The hospital alleged property damage to its building resulting from the installation of asbestos-containing products manufactured by Debtors.

These representative cases were in various stages of their own judicial and nonjudicial proceedings at the time Debtor filed its bankruptcy petition. The evidence presented during this trial was solely for the purpose of establishing the types of property damage claims Debtor was defending against traditionally. Prior to trial this Court ruled on several motions for summary judgement resolving certain issues of law raised by the parties. Some of these rulings pertain to issues in Phase I and are discussed within their appropriate context in this opinion.[16]

---

11. *See* Compl. for Damages and Injunctive Relief and Declaratory Relief filed in State of Md. v. Keene Corp., No. 1108600 (Md.Cir.Ct., Anne Arundel County). (Debtor's Ex. 907 at 1).

12. *See* Carey Canada Proof of Claim No. 2564 filed by County of Fairfax (admitted into evidence as Debtor's Ex. 2888); Celotex Proof of Claim No. 6908 filed by County of Fairfax (Debtor's Ex. 2889).

13. *See* Compl. filed in State of Ohio v. Celotex Corp. No. 84–565 (C.P.Ct., Stark County, Ohio filed April 13, 1994). (Debtor's Ex. 1384 at 1, 4).

14. *See* Compl. filed in John L. May Archbishop v. AC & S, Inc., No. 88–0386–C–5 (E.D.Mo. filed Feb. 29, 1988). (Debtor's Ex. 909 at 1, 3).

15. *See* Compl. St. Joseph's Hosp. v. The Celotex Corp., No. CV186–047 (S.D.Ga., August Div. filed March 10, 1986). (Debtor's Ex. 981 at 1).

16. *See Celotex Corp. v. AIU Insurance Co., et al. (In re Celotex Corp.),* 149 B.R. 997, 997–1003 (Bankr.M.D.Fla.) (granting the Insurance Company's Motion for Partial Summary Judgment as to Count One regarding Debtor's Claim for insurance outside of the "Products Hazard" for Asbestos-in-Building Claims and denying Debtor's Motion for Partial Summary Judgment concerning the definition of "Products Liability" Claims); *Celotex Corp. v. AIU Insurance Co., et al. (In re Celotex Corp.),* 152 B.R. 647, 647–52 (Bankr. M.D.Fla.1993) (denying Debtor's Motion for Partial Summary Judgment as regards continuous trigger of coverage); *Celotex Corp. v. AIU Insurance Co., et al. (In re Celotex Corp.),* 152 B.R. 652, 652–61 (Bankr.M.D.Fla.1993) (granting in part and denying in part Insurance Company's Motion for Partial Summary Judgment asserting no coverage exists for asbestos-related building claims involving intentional conduct, punitive damages, or equitable relief); *Celotex Corp. v. AIU Insurance Co., et al. (In re Celotex Corp.),* 152 B.R. 661, 661–67 (Bankr.M.D.Fla.1993) (granting the Insurance Company's Motion for Partial Summary Judgment asserting Debtor bears the burden of proof as to coverage on a Duty to Indemnify standard); Order Granting Continental Casualty Company's and Transportation Insurance Company's Motion for Partial Summary Judgment on Choice of Law (Nov. 24, 1992) (ruling Florida law of lex loci contractus applies to determine choice of law).

## III. FACTUAL BACKGROUND

### A. *Brief History of Asbestos*

The use of asbestos dates back as far as 4500 hundred years ago.[17] However, it was not until the early 1900's the natural fibrous mineral became commercially popular in the United States. Its commercial success was due to its tensile strength, heat and chemical resistance, and flexibility. Because of these qualities, the use of asbestos became widespread in industrial, commercial, and household applications. Asbestos was used in the manufacture of various building products such as fireproofing, thermal insulation, ceiling tiles, and roofing. Asbestos-containing products were installed in school buildings, church buildings, and office buildings. Many of these buildings remain in use today and still contain some or all of the originally installed asbestos-containing materials.

A government study estimates friable asbestos [18] exists in about one-fifth of the public and commercial buildings in the U.S., two-thirds of which contain asbestos containing materials that are damaged.[19] During World War II asbestos was used to a great extent in naval shipyards and vessels. In its peak years from World War II until the 1970s, asbestos-containing materials were installed in thousands of buildings throughout the U.S. Indeed, in its heyday asbestos was described by some as a "miraculous" mineral and a "boon to mankind".[20]

The term "asbestos" describes six fibrous minerals which fall into two varieties, amphibole and serpentine. The serpentine mineral, chrysotile, is the most commonly used in building products, and makes up more than 90% of all asbestos used.[21] When mined and processed, asbestos is generally separated into thin fibers which are then mixed with a binding agent so the fibers may be used in various products.[22] Asbestos fibers individually are invisible to the naked eye, and if released, become airborne and may be inhaled by humans. Asbestos that becomes friable is capable of releasing fibers into the atmosphere which can then be breathed by humans.[23] Asbestos in its friable state is known to pose a health risk.[24]

The health hazards of asbestos were investigated for many years, however, there is much dispute about who had knowledge of the health risks and when such knowledge was acquired.[25] Unfortunately, information concerning the health effects of asbestos did not become known to the general public until years later.[26] Many of the earlier studies conducted were focused on the health effects of asbestos to those workers who were occupationally exposed to asbestos.[27] Later studies focused on the health effects of asbestos to those not occupationally exposed, such as

17. *See generally* G. Peters & B. Peters, Sourcebook in Asbestos Diseases: Medical, Legal and Engineering Aspects A1 (1980) (discussing extensively the history of asbestos and its uses).

18. *See* 15 U.S.C. section 2642(6) (1990). Friable generally means the material can easily be crushed by hand pressure, thereby releasing fibers.

19. Environmental Protection Agency, EPA Study of Asbestos–Containing Materials in Public Buildings: A Report to Congress 7–13 (1988) [hereinafter 1988 Study] (admitted into evidence as Joint Defense Ex. 1582).

20. 1 Peters & Peters, *supra* note 17, at xiii.

21. *Id.* at A2.

22. *See* Envtl. Protection Agency, Pub. No. 20T–2003, Managing Asbestos in Place, A Building Owner's Guide to Operations and Maintenance Programs for Asbestos–Containing Materials, 2 (1990) [hereinafter The Green Book] (admitted into evidence as Joint Defense Ex. 1572).

23. *Id.*

24. 1 Peters & Peters, *supra* note 17, at B1.

25. *See, e.g., In re Joint E. & S. Dist. Asbestos Litig. (In re Johns–Manville Corp.)*, 129 B.R. 710, 737–39 (E. & S. Dist.N.Y.1991). *See generally* Paul Brodeur, Outrageous Misconduct: The Asbestos Industry on Trial (1985) (discussing in detail the asbestos industry and health hazards of asbestos).

26. *In re Joint E. & S.*, 129 B.R. at 739 ("When these studies found that asbestos was a carcinogen, this information was suppressed. The ensuing cover-up, effected through industry associations and research compacts, resulted in thousands of deaths.") (quoting Lilienfeld, *The Silence: The Asbestos Industry and Early Occupational Cancer Research*, 81 Am.J.Pub.Health 791 (1991)).

27. *See, e.g.,* Selikoff, et al., *The Occurrence of Asbestosis Among Insulation Workers in the United States*, 132 Annals N.Y.Acad.Sci. 139 (1965).

family members of exposed workers.[28] These included studies of family members who were not occupationally exposed to asbestos, but who came into contact with work-derived asbestos from family members who were exposed.[29] The studies also revealed incidents of mesothelioma and other asbestos-related abnormalities in some family members whose only known exposure was through the work derived asbestos of other family members.[30] As a result of these and other studies, the medical knowledge of the health effects of asbestos was ultimately, albeit untimely, disclosed to the general public.

### B. Government Regulation of Asbestos

In the early 1970's, the United States government began its involvement with regulation of asbestos in buildings.[31] As a result of these government regulations and the increased awareness of the dangers associated with asbestos, today the use of asbestos has practically ceased in the United States.[32] Despite, however, the numerous regulations and pronouncements by various governmental agencies, to this date there is no bright line regarding what constitutes a safe level of asbestos exposure.[33] In fact, what constitutes a safe or unsafe level of exposure to asbestos fibers is still a highly controversial issue among experts dealing with prevention of asbestos-related diseases.[34] The diverse opinions are generally based on the scientific, medical, and engineering data available, factored with technical and economic feasibility issues. These factors, together with considerations of moral duties and legal risks, have resulted in varied expert opinions of what is a safe level of human exposure to asbestos fibers.[35]

### 1. Occupational Safety and Health Administration

The Occupational Safety and Health Administration ("OSHA") regulates asbestos exposure standards in the workplace, including general industry, the construction industry, and school maintenance and custodial workers. OSHA promulgates standards for Permissible Exposure Limit (PEL) to fibers in the workplace. This standard is promulgated in terms of an eight hour time-weighted average of airborne concentrations of asbestos fibers.[36]

In June 1972, OSHA promulgated a PEL standard for exposure to fibers of 5 fibers per cubic centimeter (f/cc) for occupational exposure.[37] Then, in 1976 OSHA lowered its PEL standard to 2 f/cc.[38] OSHA lowered the standard to .5 f/cc in 1983 and in 1986 to .2 f/cc.[39] After the close of evidence in Phase I, but prior to this ruling, OSHA promulgated a new final standard setting its PEL at .1 f/cc.[40]

### 2. Environmental Protection Agency (EPA)

The Environmental Protection Agency ("EPA") began issuing a series of guidance documents in 1979 to assist and advise building owners in matters concerning asbestos in buildings. The EPA guidance book, *Asbestos–Containing Material in School Buildings: A Guidance Document, Parts 1 and 2,* referred to as the "Orange Book (1979)" was the first in a series of EPA publications.[41]

---

28. *See, e.g.,* Anderson, et al., *Asbestosis Among Household Contacts of Asbestos Factory Workers,* 330 **Annals N.Y.Acad.Sci.** 387 (1979).

29. *Id.*

30. *Id.*

31. *See* 1 **Peters & Peters,** *supra* note 17, at D27. Governments in other countries began setting standards earlier than the United States.

32. *Id.*

33. *Id.*

34. *Id.*

35. *Id.*

36. 59 Fed.Reg. 40,964 (1994) (codified as amended at 29 C.F.R. sections 1910, 1915, 1926).

37. *Id.*

38. *Id.*

39. *Id.*

40. *Id.*

41. Regulation required schools with asbestos-containing materials to retain a copy of *Asbestos–Containing Materials in School Buildings: A Guidance Document, Parts 1 and 2,* in the school's administrative office. *See* **Envtl. Protection Agency, EPA No. C00090, Asbestos–**

In its Orange Book (1979), the EPA took the position any exposure to asbestos was a health hazard and there was no known level of exposure which was safe. Building owners were advised low concentrations of asbestos fibers could have carcinogenic potential. Because such a health risk was posed, the book reported any and all exposure to asbestos in buildings should be eliminated.

Subsequent guidance documents, *Guidance for Controlling Friable Asbestos–Containing Materials in Buildings (1983)*, (the Blue Book [1983]), *Guidance for Controlling Asbestos–Containing Materials in Buildings (1985)*, (the Purple Book [1985]), and *Managing Asbestos in Place, A Building Owners Guide to Operations and Maintenance Programs for Asbestos–Containing Materials (1990)*, (the Green Book [1990]), were issued with new information on asbestos in buildings. As might be expected, subsequent texts contained the latest scientific knowledge and, accordingly, advice and recommendations reflecting this new information. None of the books are considered to have supplanted[42] previous EPA guidance documents. However, the earlier documents apparently are somewhat dated. Dr. Robert Sawyer, an author of the Orange Book and Dr. Dale Keyes, an author of the Blue Book, testified these texts are out of date because of the advances in scientific knowledge about asbestos.[43]

Based upon the more developed scientific knowledge of asbestos in buildings, there appeared to be an evolution in the advice concerning the appropriate measures building owners should take with respect to asbestos-containing materials in their buildings. Beginning with the initial guidance document, the Orange Book (1979), the recommended plan of action was the complete removal of asbestos materials as the only way to eliminate the health risk imposed by the existence of asbestos fibers in the building. In the subsequently published Blue Book (1983), building owners were advised of four alternatives to respond to the presence of asbestos in their buildings.[44] In addition to complete removal of asbestos-containing material, other alternatives suggested were to encapsulate or enclose the asbestos-containing material, or implement an operations and management ("O & M") program.[45] Despite the discussion of the four alternatives, the emphasis remained on removal as the optimum solution to asbestos in buildings.[46]

The Purple Book (1985) was a revision of the Blue Book (1983)[47] and was based upon information and input received from readers and building owners.[48] In summary, the Purple Book (1985) advises the existence of asbestos-containing material in a building

---

Containing Materials in School Buildings: A Guidance Document, Parts 1 and 2 (1985) [hereinafter **The Orange Book**] (admitted into evidence as Debtor's Ex. 1020); 40 C.F.R. part 763 (admitted into evidence as Debtor's Ex. 1028).

**42.** *The Green Book*, states "[*The Green Book* (1990)] does not supplant the 1985 Purple Book as EPA's principal guidance document. Rather, based on experience since 1985, it expands and refines the Purple Book's guidance for a special operations and maintenance (O & M) program." **The Green Book**, *supra* note 22, at vii.

A note to school districts found in the Purple Book states "This book [the Purple Book] may be kept in lieu of the document Asbestos–Containing Material in School Buildings: A Guidance Document, Parts 1 and 2 (Orange Book), to satisfy the requirement at 40 C.F.R. § 763.114(a)(5)." **Envtl. Protection Agency, Pub. No. 560/5–85–024, Guidance for Controlling Asbestos–Containing Materials in Buildings** ii (1985) [hereinafter **The Purple Book**] (admitted into evidence as Debtor's Ex. 1022).

**43.** *See* Phase I Tr. at p. 2140–41 (June 3, 1993) (Keyes testimony); *id.* at p. 8559, 8597–99 (January 18, 1994) (Sawyer testimony). Dale Leroy Keyes, a principal in the firm of Environmental Sciences, Incorporated, an environmental consulting firm. Dr. Keyes has a Ph.D. in geography.

**44. Environmental Protection Agency, Pub. No. 560/5–83–002, Guidance for Controlling Friable Asbestos–Containing Materials in Buildings** 3–1 (1983) [hereinafter **The Blue Book**] (admitted into evidence as Debtor's Ex. 1021).

**45.** *Id.*

**46.** *Id.* at 3–14.

**47.** The Purple Book is referred to as a revision of the Blue Book in the Acknowledgments of the Purple Book. **The Purple Book**, *supra* note 47, at vii.

**48.** *Id.*

does not necessarily mean the health of the building occupants is endangered.[49] Rather, its concern was the disturbance of asbestos-containing material as the cause of fibers being released and creating a potential health hazards to building occupants.[50] Given this information, the Purple Book (1985) suggests certain steps be taken to limit the exposure to asbestos-containing materials to building occupants.[51] According to the Purple Book (1985), steps to deal with asbestos-containing material, although not required by federal law, should be instituted by the "prudent" building owner.[52]

Last in the series of rainbow-colored books presented to this Court is the Green Book (1990).[53] This book's advice to building owners differs markedly from the guidance and advice given in the Orange Book (1979). By the time the Green Book (1990) was published, recommended resolution to asbestos in buildings was to leave undisturbed asbestos-containing material in place as opposed to its wholesale removal.[54] The Green Book (1990) encouraged the implementation of an operations and maintenance (O & M) program to minimize exposure to asbestos fibers.[55] According to the Green Book (1990), an O & M program entails maintaining asbestos-containing material (ACM) that is in good condition; proper cleanup of asbestos fibers previously released; preventing future release of asbestos fibers; and monitoring the condition of asbestos containing material.

With the benefit of ten more years of scientific knowledge and experience about asbestos and how it behaves in buildings, the

Green Book (1990) advises building owners of the following: [56]

Fact One: Although asbestos is hazardous, the risk of asbestos-related disease depends upon exposure to airborne asbestos fibers.

Fact Two: Based upon available data, the average airborne asbestos levels in buildings seem to be very low. Accordingly, the health risk to most building occupants also appears to be very low.

Fact Three: Removal is often not a building owner's best course of action to reduce asbestos exposure. In fact, an improper removal can create a dangerous situation where none previously existed.

Fact Four: EPA only requires asbestos removal in order to prevent significant public exposure to airborne asbestos fibers during building demolition or renovation activities.

Fact Five: EPA does recommend a proactive, in-place management program whenever asbestos-containing material is discovered.[57]

In summary, during the period of time between publication of the Orange Book (1979) and the Green Book (1990) the government and the scientific community began to realize the improper or nonprofessional removal of asbestos-containing material could be more hazardous than leaving the asbestos material in place.

### 3. Government Regulations and Statutes

Coinciding with OSHA and EPA promulgations, the government enacted legislation to address asbestos in buildings. The Na-

---

49. *Id.* at S–1.

50. *Id.*

51. *Id.*

52. *Id.*

53. **The Green Book,** *supra* note 22. In 1985 the EPA also issued **Envtl. Protection Agency, Pub. No. 600/4–85–049, Measuring Airborne Asbestos Following an Abatement Action ii** (1985) [hereinafter **The Silver Book**] (admitted into evidence as Joint Defense Ex. 1579). Dr. Keyes, the Silver Book's primary author, testified the book's focus was more narrow than the Blue Book and Purple Book and its emphasis was on measurement of airborne asbestos levels after an abatement ac-

tion. *See* Phase I Tr. at p. 1897 (Keyes testimony).

54. **The Green Book,** *supra* note 22, at viii, 3–4.

55. *Id.* at 5–29.

56. It should be noted the "Facts" found in the foreword section of the Green Book were not authored by Dr. Dale Keyes. *See id.* at vii. Dr. Keyes testified the five facts were not part of the document he reviewed and he does not necessarily agree with all the facts that appear in the foreword section of the document. *See* Phase I Tr. at p. 2255–2259.

57. **The Green Book,** *supra* note 22, at foreword.

tional Emission Standards of Hazardous Air Pollutants Act (NESHAP) (1975)[58] requires certain actions including removal, if a building owner intends to demolish or renovate a portion[59] of the building containing asbestos. Importantly, NESHAP is the only federal statute that mandates the removal, in certain circumstances, of asbestos.[60]

The Asbestos School Hazard Detection and Control Act was enacted in 1980,[61] the Asbestos School Hazard Abatement Act in 1984,[62] and the Asbestos Hazard Emergency Response Act (AHERA) in 1986.[63] AHERA required U.S. school officials to, among other things, inspect, sample, and analyze the condition of asbestos in the school.[64] In the event damaged asbestos is located in a school building, AHERA requires the school to institute management plans and response actions.[65] Further, AHERA required the EPA to conduct a study on the health hazards posed by the presence of asbestos in public and commercial buildings.[66]

In 1981 the U.S. Attorney General issued a report pursuant to the mandate contained in the Asbestos School Hazard Detection and Control Act, entitled *The Attorney General's Asbestos Liability Report to Congress,* (Debtor's Ex. No. 1023). According to testimony of Debtor's witness, Ms. Judith Meserve, the report was a blueprint to school districts on how to sue manufacturers of asbestos-containing products for asbestos-related property damage.[67] The report advised of the likelihood of the existence of asbestos containing products in school buildings. Specific asbestos manufacturers, including Debtor, were named in the report as potential defendants. There is no doubt this report promoted litigation against asbestos manufacturers.

Subsequent government reports and legislation appeared to reflect a different attitude toward resolving the asbestos in buildings problem. For example, in response to AHERA, the EPA issued a report dated February 1988, entitled EPA Study of Asbestos–Containing Materials in Public Buildings, A Report to Congress.[68] The report made recommendations such as:

"Removal of asbestos from buildings, although attractive in concept, is not always the best alternative from a public health perspective. In fact, improperly performed removal of asbestos can result in a very high level of exposure for the occupants of that building and perhaps others as well. Response actions short of removal, such as encapsulation, and good housekeeping procedures during the life of the building can be safer in some circumstances."[69]

Unlike NESHAP, AHERA does not require the removal of asbestos.

## C. Science of Asbestos

One of the chief concerns of this Court relates to the "scientific" evidence regarding asbestos and in particular, asbestos in build-

**58.** 40 C.F.R. section 61.145.

**59.** *Id.*

**60.** *See id.*

**61.** Asbestos School Hazard Detection and Control Act of 1980, Pub.L. No. 96–270, section 2, 94 Stat. 487 (codified as amended at 20 U.S.C. sections 3601–11 (1990)).

**62.** Asbestos School Hazard Abatement Act, 20 U.S.C. sections 4011–12 (1984) (admitted into evidence as Debtor's Ex. 1025).

**63.** Asbestos Hazard Emergency Response, Pub.L. 94–469, Title II, section 201, as added Pub.L. 99–519, section 2, 100 Stat. 2970 (codified as amended at 15 U.S.C. sections 2641–2656 (Supp. 1995)).

**64.** *See* 15 U.S.C. section 2643.

**65.** *See* 15 U.S.C. section 2645.

**66.** 15 U.S.C. section 2653.

**67.** Phase I Tr. at p. 462 (May 21, 1993) (Meserve testimony).

**68.** *See* 1988 Study, *supra* note 19, at 1.

**69.** The quote is found in Letter from Lee M. Thomas, Administrator, U.S. Envtl. Protection Agency to the Honorable George Bush, President of the U.S. Senate & the Honorable James C. Wright, Jr., Speaker of the U.S. House of Representatives, 2 (February 26, 1988). 1988 Study, *supra* note 19, at part VI.

ings, and whether such evidence is, in fact, based upon "scientific knowledge." [70] The Court is particularly concerned when it appears, at least in the past, that scientific research as to asbestos in buildings may have been funded or sponsored only by parties to this or similar litigation.[71] More disturbing, however, it appears the disputes surrounding scientific methodology in the area of asbestos in buildings is more litigation driven than science driven.[72] Unfortunately for science, this situation could result in a chilling effect on dissemination of factual information concerning the effects of asbestos found in buildings.[73] With these concerns in mind, the Court considers the scientific evidence presented by the parties.

### 1. Testing for Asbestos Fiber Levels in Buildings

The Court heard extensive expert testimony from both sides concerning the behavior of asbestos in building and the appropriate methodology for testing levels of asbestos fibers released or reentrained in buildings. Indeed, the witness list resembles a cast of a repertory company, given the fact many of these same witnesses have testified on numerous occasions before different audiences.[74] An example of the scientific debate

---

70. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); on remand 43 F.3d 1311 from the Supreme Court, (The Ninth Circuit explained the factors enumerated by the Supreme Court in Daubert were not exhaustive and added another factor to determine whether the proffered testimony is about scientific knowledge. The Ninth Circuit's added factor was "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinion expressly for the purpose of testifying.")

71. 2 **Peters & Peters,** supra note 17, at 1–2.

72. See, e.g., Phase I Tr. at p. 4324 (June 16, 1993) (Longo testimony)

THE COURT: Dust sample, size of can, size of filter, like that. Are all these, let's say, in our contemporary times, not going back to the aged studies, but in contemporary times, are all these disputes litigation or are all these disputes on the scientific method litigation driven or science driven?
THE WITNESS: To be honest with you, it seemed to pop up when litigation started. There was easily the indirect and the direct methods were started back in '84 or '83. Just like everybody calls the dust method the indirect method, that wasn't me who started that nomenclature, but if you ask any scientist out there about the EPA water method, which all's it is water with asbestos in it that you have to sonicate for 15 minutes and put it through a filter, nobody ever calls that an indirect.
 So a lot of this nomenclature has come up because litigation, because people have taken sides. Before the litigation started, there wasn't really this—this whole issue arose;
Id. at 4326–4327 (discussing the use of non scientific measurements for the purpose of litigation)
THE COURT: Results structure per square foot—
THE WITNESS: Yes, sir.

THE COURT: —would not be a measurement that we would normally see in the scientific literature, would we?
THE WITNESS: No, sir. It would be centimeters squared.
THE COURT: Are results from air samples in centimeters square?
THE WITNESS: Actually, they're cubic centimeters since an air sample takes a three dimensional versus a—

THE COURT: Let me ask you this: Will the dust protocol speak to structures per square foot or—
THE WITNESS: It gives it the ASTM protocol is structures per centimeter squared. The scientist in that committee say we will use metric. What we do is we give the client an option for both, because it's interesting, a lot of clients cannot deal with square centimeters.
THE COURT: Wouldn't that also be true of juries?
THE WITNESS: Juries tend to have a harder concept to see that.

73. 2 **Peters & Peters,** supra note 17, at 2.

74. See, e.g., Phase I Tr. at 4542–43 (June 17, 1993) (Longo testimony) the court questioning Dr. Longo:
THE COURT: And I would assume that most of the questions that were asked you over the last two days did not come as a genuine surprise?
THE WITNESS: I'll have to admit that. No, sir.
THE COURT: Okay. If you were going to trial next week as a witness, as an expert witness, and doing all these studies on some building somewhere that you had done either air or whatever samples you've done and you were going to testify, who would you presume, if you were to predict what witnesses, expert witnesses in your field would probably be against you?
THE WITNESS: Well, as the microscopy side, I would say either Dr. Eric Chatfield or Dr. Rich Lee, probably one of those two.

is found with the evidence regarding the appropriate method to employ when testing for levels of asbestos fibers found in the air.

### a. Sampling Methods

Debtor's experts contend the dust sampling method is the appropriate method to measure for asbestos concentration levels within a building. Defendants' experts, on the other hand, contend air sampling is the appropriate method to most accurately measure asbestos concentration levels within a building. The two methods for testing for asbestos fiber levels, air sampling and dust sampling were explained and demonstrated to the Court. Both methods involve the collection of samples to test for concentration levels of asbestos fibers. Once the fiber sample is collected via one of these methods, it is then analyzed either under a phase contrast microscope (PCM) or a transmission electron microscope (TEM).[75] According to the testimony, the dust sampling method identifies the presence and concentration of asbestos in dust that has settled on a surface in a building. The air sampling technique will determine the level of respirable airborne asbestos at a given point in time.

In most simple terms, the dust sampling method involves the collection of settled dust from horizontal surfaces such as desks, window sills, the top sides of ceiling tiles, floors etc., which is then analyzed under microscope. As demonstrated to the Court, the settled dust is vacuumed from the surface into a tube which filters into a cassette. After the dust is collected on the cassette it then goes through what is known as an "indirect" method of analysis. This analysis involves removing the dust from the collecting filter[76] and then mixing it in a solution of water and hydrochloric acid. The solution is then diluted, vigorously shaken, and put through a sonication process. After this process, the diluted solution is analyzed under microscope to determine the presence and amount of asbestos fibers contained in the sample.

Defendants' experts criticize the indirect method of preparation as inaccurately exaggerating the number of asbestos fibers counted. They contend the method dissolves non-asbestos binders which hold fibers together resulting in individual fibers being released and counted separately. According to Defendants' experts, there is a general consensus in the scientific community the indirect method of preparation improperly increases the number of asbestos structures counted because it alters the physical form of the asbestos fibers.

Moreover, Defendants' witnesses were quick to point out in general, the weaknesses of the dust sampling methodology. First and foremost, they point to the fact the dust sampling method does not measure *airborne* asbestos fibers. Dust sampling, Defendants' experts contend, only measures settled dust with no way to determine from that data when the asbestos fibers contained in the dust were released and for how long they were airborne before settling. Furthermore, they contend it is unlikely the settled fibers are reentrained or resuspended into the air as easily as suggested by Debtor's expert witness. Defendants argue another weakness of this method is the lack of an adopted dust sampling protocol by the scientific community in which to collect the sample to be tested. According to Debtor's own witnesses, Dr. William Longo[77] and Mr. Rich-

---

THE COURT: In other words, they appear at these things as much as you do?
THE WITNESS: Yes, sir.
THE COURT: Who would you be surprised to see?
THE WITNESS: Probably anybody but those two.
(The Court does not suggest these witnesses are not credible, only that they are experienced.)

75. *See* Lee S. Siegel, *As the Asbestos Crumbles: A Look at New Evidentiary Issues in Asbestos–Related Property Damage Litigations*, 20 **Hofstra L.Rev.** 1139, 1151–57 (1992).

76. As demonstrated to the Court, there is a distinction between the indirect preparation and the direct preparation for analyzing samples under microscope. Generally, under the "indirect" preparation particles are removed from the collecting filter and replaced on a second filter before being analyzed under microscope. Under the "direct" preparation the particles are analyzed on the original collecting filter.

77. Phase I Tr. at 4074–86 (June 16, 1993) (qualification of Dr. William Longo).

ard Hatfield,[78] at the time the dust samples introduced into evidence were taken, there was no adopted protocol for the collection of dust samples.[79]

Another variation of the dust sampling method involves the collection of dust by placing collection containers in various locations of the area tested. After the containers are in place for a specified period of time the dust collected is analyzed in the same manner previously described. This "tin can" [80] or fallout variation of the dust sampling method was criticized by Defendants' experts as being an unreliable means of testing for airborne asbestos fibers. Defendants assert the lack of control and supervision of strategically placed tin cans make any test for asbestos fibers using that methodology especially susceptible to false results. A prime example of this weakness was brought out on cross-examination of Debtor's expert witness concerning the test conducted at the Kansas City Airport.[81] In that test, several tin cans used to collect dust were placed in various passenger areas of the airport. At the completion of the collection period, all but two of the tin cans were collected for analysis of fiber concentration levels. Apparently, two tin cans were missing, therefore, no analysis could be made of their contents.[82] Since the test containers were either lost or stolen, it is not inconceivable that other test containers could be vandalized or corrupted in some way. According to Defendants, this example demonstrates any results using this methodology are suspect and should not be relied upon.

Further testimony of Debtor's witness, Mr. Hatfield, revealed other deficiencies of the dust sampling method.[83] While the experts agreed the accuracy of the dust sample is dependent in large part on the accuracy of the collection of the sample, in this Court's view, Mr. Hatfield's methodology used to collect dust samples seemed anything but precise and accurate. It was brought out in testimony that Mr. Hatfield's imprecise techniques could result in a measurement of much higher concentration levels of asbestos fibers.[84]

Using the air sampling method, air within a defined space is collected through a filter. Any particles collected on the filter are then analyzed under microscope to test for the presence of, and to determine the concentration of asbestos fibers for the tested site. Debtor's experts criticized the use of this methodology as not giving an accurate reading of airborne asbestos levels. This method only measures the level of asbestos concentration at the given point in time when the air sample is collected. Therefore, if there does not happen to be any fibers in the air at the immediate moment the sample is taken, the measurement is misleading if, in fact, there are asbestos fibers in the air at the next moment.[85]

78. Phase I Tr. at 4939 (Dec. 9, 1993) (qualifications of Richard Hatfield). Richard Hatfield is a Corporate Consultant and an Assistant Vice President for Law Engineering.

79. Phase I Tr. at p. 5422 (Dec. 10, 1993) (Hatfield testimony) Hatfield testified the eighth draft of a proposed protocol for dust sampling was being circulated for peer review at the time of his testimony; Id. at 4540–41 (June 17, 1993) (Longo testimony).

80. See Phase I Tr. at p. 4253–56 (June 16, 1993) (Longo deposition) Debtor's witness explained the collection containers used resembled the shape and size of tuna fish cans.

81. Phase I Tr. at p. 5422–23 (Dec. 10, 1993) (Hatfield testimony).

82. Phase I Tr. at p. 5149 (Dec. 9, 1993) (Hatfield testimony). Id. at 4255–56 (June 16, 1993) (Longo testimony).

83. See, e.g., Phase I Tr. at 5580, 5589–5596, 6501 (Dec. 13, 1993) (Hatfield testimony). Apparently, Mr. Hatfield would measure the areas in which dust was collected after the dust had been collected by measuring the demarcation left by the vacuum; Id. at 5592–93, 5662–64. Further, on at least one occasion demonstrated to this Court, Mr. Hatfield did not use a straight edge to draw lines around the area to be measured, and ended up with lines that were not drawn straight and precise. Thus, there were no scientifically established parameters to the sample.

84. Phase I Tr. at p. 4288, 4414 (June 16, 1993) (Longo testimony); Id. at 5559–5561 (Dec. 13, 1993) (Hatfield testimony).

85. Cf., Phase I tr. at 2167 (June 3, 1993) (Keyes testimony) Dr. Keyes agrees that the best method to measure airborne levels of asbestos is the air sampling methods.

### b. Measurement of Dust and Air Samples

As stated above, asbestos fiber concentration levels are measured by either phase contrast microscopy (PCM), or transmission electron microscopy (TEM).[86] Of the two, PCM continues to be the most widely used technology despite several limitations.[87] The most significant of those limitations pointed to by Defendants is PCM's inability to differentiate between asbestos and non-asbestos fibers.[88] PCM has the capability of measuring only fibers which are greater than 5 microns in length and only magnifies about 600 times.[89] As a result, PCM measures non-asbestos fibers as well as asbestos fibers which results in overestimated asbestos concentration levels in ambient air.[90] Despite TEM's ability to measure asbestos fiber concentrations more precisely,[91] the government standards are still set to PCM standards and its capabilities.[92]

The parties presented evidence to this Court of asbestos concentration levels taken in the eight representative cases. The Debtor's put on evidence of high levels of asbestos contamination existing in the buildings tested. Defendants' evidence on the other hand, concluded the levels of asbestos found in buildings tested were insufficient to cause disease in the building occupants.[93] The Defendants' evidence further concluded that in the vast majority of buildings tested there was no significant difference between indoor levels of asbestos and outdoor levels of asbestos.[94] The Debtor arrived at its results using the dust sampling technique and Defendants arrived at their results using the air sampling technique. Thus, the results obtained were not reported in the same standard measurement. To compare the results presented by Debtors to those presented by Defendants is tantamount to comparing malus sylvestris with citrus sinensis. The experts testified there is no correlation between asbestos concentration in the air and asbestos concentration in the dust thus no correlation exists to compare the two.

### c. Ambient Levels of Asbestos Fibers

According to the scientific evidence, asbestos can be found throughout the world in the air we breathe and in the water we drink.[95] Defendants presented evidence of concentration levels of asbestos fibers found in ambient air. Defendants' results established external ambient air levels of asbestos fibers were similar to those levels found in the interior ambient air of a public buildings. Thus suggesting, building occupants are not at risk of contracting asbestos related diseases.[96] Debtor, on the other hand, presented evidence suggesting internal ambient air levels of asbestos fiber concentrations can increase dramatically if ACM within a building is disturbed. Such a disturbance of ACM could take place as a result of activities as innocuous as custodial workers performing routine duties or as drastic as a major leak in a building water main. In either event, there is an episodic release of asbestos fibers into the internal air of the building which may well exceed the external ambient levels.

86. *See* Siegel, *supra* note 75, at 1151–57.

87. *See id.* at 1153–55. TEM is substantially more expensive than PCM technology. *See id.* at 1155–56.

88. The definition of asbestos fiber is one that has a ratio of length to diameter of equal to or greater than 3 to 1, and is longer than 5 microns. Siegel, *supra* note 75, at 1152–53. PCM cannot detect fibers thinner than 0.25 and 0.5 microns, TEM, on the other hand, can detect fibrils as thin as 0.01 microns. *Id.* at 1153. Further, PCM cannot distinguish between the type of asbestos fiber. *Id.*

89. *Id.* at 1152.

90. *Id.* at 1153–54.

91. *Id.* at 1155–56.

92. *Id.* at 1156.

93. Phase I Tr. at 9208–9213 (January 26, 1994) (Bragg testimony).

94. Phase I Tr. at 9552. (January 31, 1994) (Bragg testimony).

95. *See,* Phase I Tr. at 8651 (Jan. 21, 1994) (testimony of Dr. Gibbs); *Id.* 9149 (Jan. 26, 1994) (testimony of Dr. Craighead).

96. Phase I Tr. at 8673–8674 (Jan. 21, 1994) (testimony of Dr. Gibbs); *Id.* at 9176–9180, 9189–9190, 9201 (Jan. 26, 1994) (testimony of Dr. Craighead).

## 2. Health Aspects of Asbestos

Phase I involves only property damage claims, and not bodily injury claims, nonetheless, the health aspects of asbestos necessarily play an integral part of the evidence considered. As such, much of the evidence introduced includes expert opinions concerning the health aspects of asbestos. The health hazards potentially posed by airborne friable asbestos are central to the claims made by building owners who allege their buildings have been damaged by the existence of friable asbestos. From this evidence the Court discerns that despite medical and scientific knowledge now available in the area of asbestos, the experts still do not agree on certain basic premises. Specifically, Debtor's and Defendants' experts do not agree on what types of asbestos fibers cause certain asbestos related diseases or at what level of exposure such disease may be caused.[97]

A core debate central to asbestos fiber concentration narrows to primarily two schools of thought among the respected scientists in this field. One camp, generally considered as lead by Dr. Irving J. Selikoff, espouses the view that all types of asbestos are dangerous and carcinogenic at any level of concentration.[98] This theory is sometimes referred to, especially by those disagreeing, as the one-fiber phobia.[99] Those subscribing to this theory, maintain one inhaled fiber of asbestos will cause an asbestos related disease, thus, one-fiber phobia.[100]

The other camp, is generally considered to be lead by Dr. Brooke T. Mossman. The Mossman camp adheres to the theory, Chrysotile, the most prevalent form of asbestos in place, poses little or no health risk when intact and properly managed.[101] According to those in the Mossman camp, it is the one-fiber phobia that has lead to the massive unwarranted abatement of asbestos in buildings.[102]

The evidence suggests it is generally undisputed asbestosis, mesothelioma, lung cancer, and other lung related ailments are related to exposure to asbestos fibers. According to the medical and scientific evidence presented, an asbestos related disease may result when an asbestos fiber is inhaled into the lungs and then remains in the lung by overcoming the clearing and defense mechanisms of the human body. Asbestos fibers that remain in the lung can pierce the cells of the lung wall, and gradually tumors will begin to develop around the imbedded fibers. As the asbestos fibers accumulate in the lung they begin to impair the lung's ability to function. The diseases resulting from the accumulation of asbestos fibers in the lung are noncurable and, at least in the case of mesothelioma, fatal.

### D. Representative Cases

Debtor presented to this Court eight cases which they believe are prototypical of the hundreds of pending, and potentially pending, asbestos related property damage claims. These cases were selected to establish the nature of asbestos related property damage claims made in underlying actions against Debtor by third parties.[103] Further, the evidence offered by Debtor seeks to establish the nature of the evidence offered

---

97. *See* Phase I Tr. at p. 9197–9223 (Jan. 26, 1994) (Craighead testimony) concerning different types of asbestos and various threshold levels; *Id.* at p. 8672 (Jan. 21, 1994) (Gibbs testimony); *Id.* at 8674, 8677–8680, 8685, 8689–8690. Experts testifying on behalf of Defendants point to various epidemiological studies to demonstrate the difference in effects of exposures to chrysotile and amphibole structures. Such studies include the gas mask studies of English workers during World War II. Military and non-military gas masks were produced at two different manufacturing plants. The military gas mask was manufactured with crocidolite asbestos the non-military gas mask was manufactured with chrysotile asbestos. Studies of the workers showed significant number of mesotheliomas cases in those who worked at the military gas mask plant, but not in those who manufactured the non-military gas mask.

98. Siegel, *supra* note 75, at 1144–1147.

99. *Id.*

100. *Id.*

101. *Id.* at 1143–1145.

102. *Id.* at 1146.

103. *See In re Celotex Corp.,* 152 B.R. 661, 665 (Bankr.M.D.Fla.1993).

*against* Debtor in asbestos related property damage claims.

According to Debtor's witnesses, a typical pattern of evidence was presented in the underlying cases. Asbestos was found to exist in a building owned by building owner. The particular asbestos product was identified to have either been mined or manufactured by Debtor. The asbestos was friable or became friable due to some physical act, or due to natural aging and deterioration. The asbestos fibers were released into the building's internal atmosphere, thereby exposing building occupants to the asbestos fibers. Finally, building owners believed such asbestos was either harmful, or threatened to be harmful to inhabitants of the building. The following is a discussion of the evidence presented and considered as it pertains to the eight representative cases.

1. The Federal Reserve Bank (Federal Reserve)

In March of 1986, Debtor was named as a defendant in a suit brought by the Federal Reserve Bank (Federal Reserve) located in Minneapolis, Minnesota.[104] The suit alleged a fireproofing product called Firebar installed in the building caused damage to the building and sought recovery based on various theories, including, restitution, negligence, strict liability, fraud and misrepresentation, conspiracy, declaratory judgment, building monitoring, medial monitoring, and superfund liability.[105] A summary trial was conducted and ultimately the case was settled by Debtor for 5.5 million dollars.[106]

Firebar is a spray-applied fireproofing material used to provide fire protection. Debtor produced the Firebar, at the request and

direction of Universal Firebar Inc. The Firebar was then installed in the Federal Reserve during the period of 1971–1972—primarily in air shafts, electrical closets and the plenum areas between the ceiling and the roof.[107]

During the summary trial, the plaintiff was able to identify the Firebar as being a product attributable to Debtor. Invoices were produced showing bags of the fireproofing material as having been shipped by Debtor to the Federal Reserve. The fireproofing material was also attributed to Debtor in a report prepared by an asbestos consultant, Survey Group.

It was alleged that after the Firebar was installed, asbestos was released into the air causing a health hazard to building occupants including maintenance and custodial workers.[108] The underlying plaintiff produced at trial evidence by expert testimony concerning the condition of the asbestos materials contained in the building. Generally, the testimony indicated there was substantial fallout and delamination of the asbestos material. Chunks of debris had fallen from the structure and situated on top of the ceiling tiles. The fireproofing material was classified as in fair condition by plaintiff's expert.[109] Dust samples were collected throughout the building and tests were conducted on the collected samples.

The plaintiffs in *Federal Reserve* put on as expert witnesses Dr. Dale Keyes and Mr. Richard Hatfield.[110] According to the testimony of both Hatfield and Keyes, the likelihood of continued release of asbestos fibers

---

104. *See* Compl. filed in Fed. Reserve Bank v. Carey–Canada, Inc. (D.Minn. filed March 4, 1986). (Debtor's Ex. 872 at 1).

105. *See id.* at 3–13.

106. *See* Celotex Asbestos Property Damage Cases: Costs & Settlement Amounts (admitted into evidence as Joint Defense Ex. No. 767).

107. Phase I Tr. at 2384–94 (June 4, 1993).

108. *See* Compl. filed in Fed. Reserve Bank v. Carey–Canada, Inc. (D.Minn. filed March 4, 1986). (Debtor's Ex. 872 at 3–13).

109. Phase I Tr. at p. 2060–61 (June 3, 1993) (Keyes testimony).

110. *See* Phase I Tr. at 5151 (Dec. 9, 1993) (Hatfield testimony); *id.* at 2057–75 (June 3, 1993) (Keyes testimony) Dr. Keyes and Mr. Hatfield were expert witnesses before this Court. *See id.* at 1888 (qualifying testimony for Dr. Keyes) and 4939 (qualifying testimony for Mr. Hatfield). The testimony discussed in this section refers to testimony given to this Court by Dr. Keyes and Mr. Hatfield about the Federal Reserve Bank case.

into the air was very high.[111] They opined continued release of asbestos fibers would occur due to disturbance of the asbestos material caused by routine activities such as maintenance of the heating system, halon fire control system, and electrical system to name a few.[112] The underlying plaintiffs also introduced evidence of release of the asbestos fibers into the air being caused by the natural aging and deterioration of the fireproofing material.[113] Hatfield testified the surfaces from which samples were taken were significantly contaminated and it was his opinion complete removal of asbestos was the appropriate course of action.[114] According to the evidence, notwithstanding the settlement payment of 5.5 million dollars, the asbestos-containing Firebar, has not been removed from the Federal Reserve Building.[115]

### 2. Adams Arapahoe School District [116]

The Adams Arapahoe School District in Aurora, Colorado filed suit against Debtor in 1984 seeking recovery on theories of strict liability, negligence, breach of implied warranties, breach of expressed warranties, fraud and misrepresentation, conspiracy, deceptive trade practices, nuisance, and indemnity.[117] The suit alleged Aircell, a thermal pipe insulation, was installed in a number of school buildings and Protectone F, a ceiling tile, was installed in a single school building. The suit alleged asbestos fibers contained in the products were released and reentrained or resuspended into the air, thereby causing a health hazard to building occupants—primarily school children.[118]

The trial of the underlying case was conducted in phases and resulted in a verdict against Debtor for $134,000 in the first phase. Debtor subsequently settled the entire case for $400,000.[119] At trial it was established both products were manufactured by Debtor and contained asbestos.

According to the evidence presented, asbestos fibers were released from the pipe insulation beginning when the building was originally constructed, and continuing to when the pipes were repaired or replaced. There was also evidence of fiber releases on a regular basis when pipe insulation on the ground would further deteriorate. The underlying case also alleged and presented evidence concerning the asbestos-containing ceiling tile manufactured by Debtor. Over time, asbestos fibers were released as a result of the ceiling tiles being disturbed by the activities of rambunctious students such as jumping up and poking holes in it with pencils.

Mr. Donald Toft, an employee of the school district since 1973, testified concerning the condition of the asbestos-containing materials in the various school buildings.[120] He relayed particular incidents of disturbance that caused release of asbestos fibers found on the ground in pipe tunnels. According to Mr. Toft, there were releases of asbestos fibers during the original construction of the buildings in the early 1950's, during periods of repair and replacement of pipes in the mid 1970's, during boiler replacement in the early 1980's, and continuously when the insulation in the ground would deteriorate.[121] Mr. Toft testified soil samples were taken in certain

111. *See* Phase I Tr. at 2060–75 (Keyes testimony) and 5306–08 (Hatfield testimony).

112. *See id.*

113. *See id.*

114. Phase I Tr. at 5166, 5175 (Dec. 9, 1993) (Hatfield testimony).

115. Phase I Tr. at p. 1087–88 (May 26, 1993) (Meserve testimony); Phase I tr. at p. 2394–2401 (June 4, 1993) (Keyes testimony); Phase I tr. at p. 6089–90 (Dec. 15, 1993) (Hatfield testimony).

116. *See* Compl. filed in Adams–Arapahoe Sch. Dist. No. 28–J v. Celotex Corp. (D.Colo.) (Debtor's Ex. 801 at 1).

117. *See id.* at 2–7.

118. *Id.*

119. *See* Celotex Asbestos Property Damage Cases Costs & Settlement Amounts at 1 (Joint Defense Ex. 767).

120. Mr. Donald Toft was Asbestos Coordinator for Mechanical Systems for Adams Arapahoe School District. Phase I Tr. at p. 2483–95, (June 7, 1993) (Toft testimony).

121. Phase I Tr. at p. 2492, 2511–12, 2624–26 (June 7, 1993) (Toft testimony).

areas which concluded there were asbestos fibers in half of the samples taken.[122] The threat of hazard resulting from the asbestos release caused concern to parents and school officials, to the point of what some have characterized as hysteria.[123] The evidence suggests an overnight change in policy by the school board concerning asbestos.[124] Prior to an asbestos incident at one of the elementary schools, the school board policy on asbestos was encapsulation, after the incident, the policy was changed to removal.[125] Notwithstanding the public concern evoked in the *Adams–Arapahoe* case, the evidence at trial suggests some asbestos still remains in the school buildings.[126] Only portions of asbestos were removed in conjunction with renovation and remodeling projects done over the years.[127]

### 3. Kansas City International Airport [128]

Kansas City filed a complaint against the Debtor in 1986 seeking recovery on theories of negligence, strict liability, breach of implied warranties, breach of express warranties, fraud and misrepresentation, building monitoring, and conspiracy. The complaint alleged a fireproofing material, Asbestospray was installed in the airport facility and contained asbestos fibers mined by Debtor.

These asbestos fibers were then allegedly released into the air causing damage to the airport facility. Prior to its completion, the suit was stayed under section 362(a) of the Bankruptcy Code when Debtor filed its petition for relief. Subsequently, a proof of claim was filed in this case by the underlying claimants.

At trial of the underlying case, a spray applied mineral chrysotile, known as Asbestospray, was identified as being present on the ceiling of the passenger service area of the airport terminal.[129] Debtor's fiber was established as the asbestos fiber contained in Asbestospray. The spray-applied fireproofing material was installed on the ceiling throughout certain passenger areas of the terminal.

Dr. Dale Keyes [130] testified on behalf the underlying plaintiffs to the condition of the Asbestospray in the terminal.[131] According to the testimony, there was water damage, physical damage, and deterioration which resulted in visible dust and debris accumulation in various areas of the passenger terminals.[132] Mr. Richard Hatfield [133] also inspected the airport and gave testimony as to dust sample results and the condition of the Asbestospray in the airport. According to Mr.

**122.** Phase I Tr. at p. 2631–34 (June 7, 1993) (Toft testimony).

**123.** Phase I Tr. at p. 3333–35, 3339–40, 3640–41 (June 7, 1994) (Miller testimony); Phase I Tr. at p. 2613 (June 7, 1993) (Toft testimony); Phase I Tr. at p. 2765 (June 7, 1993) (Sohrweid testimony); Phase I Tr. at p. 2693–94 (June 7, 1993) (Bartell testimony).

**124.** Phase I Tr. at p. 2765–66 (June 7, 1993) (Sohrweid testimony); Phase I Tr. at p. 3642 (June 11, 1993) (Connon testimony).

**125.** Phase I Tr. at p. 2756–58 (June 7, 1993) (Sohrweid testimony); Phase I Tr. at p. 3335–35, 3339–41 (June 9, 1993) (Miller testimony); Phase I Tr. at p. 2613 (June 7, 1993) (Toft testimony); Phase I Tr. at p. 2765 (June 7, 1993) (Sohrweid testimony); The incident involved an encapsulation project at one of the elementary schools over the holiday break from Dec. 1983–January 1984. After the encapsulation project classes resumed, however, the classrooms were not thoroughly cleaned and non-asbestos dust remained on the school desktops. Fearing the remaining dust was asbestos, hysteria broke out among concerned parents and teachers.

**126.** Phase I Tr. at p. 2488, 2499, 2504, 2507 (June 7, 1993) (Toft testimony); Phase I Tr. at p. 2656, 2717, 2736 (June 7, 1993) (Bartell testimony).

**127.** *Id.*

**128.** *See* Debtor's Ex. 890 at 1 (showing caption page for Kansas City v. W.R. Grace & Co., No. CV86–19615 (Mo.Cir.Ct. Jackson County filed August 12, 1986)).

**129.** Phase I Tr. at 5139 (Dec. 9, 1993) (Hatfield testimony).

**130.** Phase I Tr. at p. 1888–1890 (June 3, 1993) (Keyes testimony).

**131.** Phase I Tr. at 2094 (June 3, 1993) (Keyes testimony).

**132.** Phase I Tr. at p. 2096 (June 3, 1993) (Keyes testimony).

**133.** Phase I Tr. at p. 4942 (Dec. 9; 1993) (Hatfield testimony).

Hatfield, although the ceiling was inaccessible to passengers, there was no barrier to prevent the dust and debris from falling onto the areas below including airport patrons.[134] Further, he testified normal and routine maintenance to ceiling fixtures, light fixtures, speakers, and windows would cause the material to be disturbed and result in more fiber release.[135]

At Mr. Hatfield's direction, dust samples were taken of the existing dust and debris inside one of the terminals.[136] Dr. William Longo analyzed the dust samples and reported his results in terms of the number of asbestos structures per square foot.[137] In addition, fall out samples were collected by strategically placing tin cans around the passenger areas and leaving the tins in place for approximately six months.[138] Some of the tins were placed in areas of the airport with non-ACM containing material on the ceiling.[139] Other tins were placed in the areas with ACM on the ceilings.[140] When the remaining tins were collected Dr. Longo analyzed the samples and concluded that the fall out samples came from the Asbestospray. Mr. Hatfield concluded, based on the analysis, the dust sample results indicated a substantial contamination of the areas sampled.[141]

### 4. Maryland State Cases

In 1984 a complaint was filed against Debtor seeking recovery of 500 million dollars based on theories of negligence, strict liability, breach of warranty, civil conspiracy, concert of action, and enterprise liability.[142] The suit involved various buildings owned by the state of Maryland which were built with asbestos-containing materials. The complaint alleged 125 of the buildings contained products manufactured by Debtor.

In the pretrial phase of the case the specific building claims against the Debtor were reduced to $500,000. The suit was ultimately settled by Debtor for $190,000, but Debtor filed its petition for relief prior to paying the settled amount. (*See* Joint Defense Ex. No. 767; *supra* note 108). A proof of claim has been filed against this estate for the $190,000.

Debtor's products—Protectone, Spraycraft, and block and ceiling tiles—were identified and alleged to contain asbestos. The products were installed in the various state buildings between 1940–1972, and according to witnesses, the ACM remains in some of the buildings at the time of this trial.

Testimony from Mr. Drake Zaharris [143] indicated the asbestos containing material in the buildings was in poor condition. Photographs were admitted into evidence depicting asbestos materials having fallen onto the floor. Photographs were also presented which showed insulation material containing asbestos in poor condition and hanging from pipes. As a result of the poor condition of the asbestos products, the evidence suggested fibers were released into the air causing harm, or potentially causing harm, to building occupants.

### 5. Fairfax County Buildings

Fairfax County alleged that products manufactured by Debtor and installed in its Massey Building released asbestos fibers in the

---

**134.** Phase I Tr. at 5138–41 (Dec. 9, 1993) (Hatfield testimony).

**135.** Phase I Tr. at p. 5141 (Dec. 9, 1993) (Hatfield testimony).

**136.** *Id.* at 5141–42.

**137.** *See* id. at 5145; Debtor's Ex. 1528.20; Phase I Tr. at p. 4258–69 (June 16, 1993) (Longo testimony); Debtor's Ex. 1529.5.

**138.** *Id.* at 5146–47; Phase I Tr. at p. 4255–58 (June 16, 1993) (Longo deposition).

**139.** *Id.* at 4259–60.

**140.** *Id.* at 5147.

**141.** Phase I Tr. at 5144 (Dec. 9, 1993) (Hatfield testimony).

**142.** *See* Compl. for Damages and Injunctive Relief and Declaratory Relief filed in State of Md. v. Keene Corp., No. 1108600 (Md.Cir.Ct. Anne Arundel County). (Debtor's Ex. 907 at 1).

**143.** Phase I Tr. at 6941 (Dec. 20, 1993) (Zaharris testimony). Drake Zaharris is an attorney with the firm of Parks, Hanson, Ditch & Zaharris, of Towson Maryland. Mr. Zaharris represented Celotex and Carey Canada in the underlying Maryland State property damage cases.

building and caused damage to the building. At the time of Debtor's bankruptcy petition, no lawsuit had been filed, subsequently, claimants filed proofs of claim in the bankruptcy case.[144]

The fireproofing product Spraycraft and other asbestos-containing surfacing material were identified as being installed in the Massey building. Product identification of Spraycraft was made, rather easily, by a product brochure touting the qualities of Spraycraft and depicting the Massey Building as one of the many buildings using Debtor's product.[145]

Mr. Hatfield conducted a personal inspection of the building and described the overall condition of the Spraycraft in the building as fair.[146] The Spraycraft was installed primarily above suspended ceilings and in mechanical and electrical closets. Mr. Hatfield observed certain areas of the fireproofing material appeared disturbed and deteriorating, with some of the fireproofing material hanging off.[147]

Although the areas containing the Spraycraft product were generally off limits or inaccessible to the general public, Mr. Hatfield testified there were indications of frequent or regular contact with the fireproofing by building custodial and maintenance workers.[148] Activities such as routing cable or rewiring appeared to have disturbed asbestos materials in the drop ceiling areas.[149] Videotapes and slides of these areas were shown during trial to support Mr. Hatfield's description of the disturbed, asbestos-containing material.

During his inspection of the Massey Building, Mr. Hatfield took dust samples or directed that dust samples be taken.[150] Dr. Longo analyzed the collected samples and concluded the fiber structure counts demonstrated severe contamination.[151] Moreover, Hatfield testified asbestos fibers are very frequently reentrained in the Massey building. Dr. Longo further testified that a carpet sample he analyzed could not be completely cleaned of the asbestos fibers it contained. Hatfield testified the dust sample results from the Massey building show significant asbestos contamination to other property within the building, such as carpeting.[152]

Mr. Michael Harkness [153], a Fairfax County employee, charged with the duty of coordinating asbestos activities as they related to county owned buildings, testified on behalf of Debtors. According to Mr. Harkness, in 1985 Fairfax County installed a HEPA filtration system to remove asbestos structures from the air, and as a result 99.97% of the asbestos structures are removed by this system. He also testified Fairfax County had not removed any asbestos-containing material from the Massey Building with the exception of removal in conjunction with a renovation project. According to the evidence, notwithstanding the continued existence of asbestos, the building is still in use as a public building.

### 6. Massillon Geriatric Center for the Living

In 1984 the State of Ohio and the Ohio Department of Mental Health filed an action against Debtor for damages associated with the asbestos-containing material, Spraycraft,

144. *See* Carey Canada Proof of Claim No. 2564 filed by County of Fairfax (Debtor's Ex. 2888); Celotex Proof of Claim No. 6908 filed by County of Fairfax (Debtor's Ex. 2889).

145. Phase I Tr. at 4968, 4971 (Dec. 9, 1993) (Hatfield testimony).

146. *Id.* at 4974–75, 4979 (Dec. 9, 1993) (Hatfield testimony).

147. *Id.* at 4985.

148. *Id.* at 4982–85.

149. *Id.* at 4985.

150. *Id.* at 5027.

151. *Id.* at 5027.

152. *Id.* at 5048.

153. Phase I Tr. at 5756–63 (Dec. 14, 1993) (Harkness testimony). Mr. Harkness is a senior energy engineer for Fairfax County. His duties included identifying buildings with asbestos present, developing plans for management of the asbestos in buildings, identifying those building where asbestos removal was needed, and overseeing asbestos removal projects.

installed in the attic of the Massillon Geriatric Center for the Living (Massillon). The plaintiffs sought recovery on several theories including negligence, strict liability, breach of express warranties, breach of implied warranty, deceit, conspiracy, restitution, and indemnification.[154] Debtor settled the case in 1986 for $450,000. (*See* Joint Defense Ex. 767; *supra* note 108).

Spraycraft is a spray-applied fireproofing material manufactured by Debtor. Through the discovery process, documents, including invoices, were produced linking Spraycraft with Debtor, establishing that the Spraycraft insulation was installed in the attic areas of the building during 1971–1972 and began delaminating and falling off as early as 1971. The suit alleged asbestos fibers released into the air caused property damage when the Spraycraft product fell off in chunks—breaking tiles off the suspended ceiling below. According to the documents produced, the product continued to fall off for several years and based on visual reports, the Spraycraft had severely deteriorated and had fallen through the acoustical ceiling below it. Documents produced indicated the reason for the delamination and the material falling off may have been due to improper installation of the Spraycraft. These documents tended to provide Debtor with a possible defense based on improper insulation of the Spraycraft product.

A report to the Ohio Department of Mental Health dated June 30, 1982 [155], reported sample results and recommended the Spraycraft be removed. In its recommendation, the report also stated position of the EPA and the scientific community concerning exposure to asbestos in buildings.[156] Massillon ultimately removed and replaced the Spraycraft.

### 7. Archdiocese of St. Louis

In 1988 the Archdiocese of St. Louis, owner of the largest school district in Missouri, as well as various churches, hospitals and residences, filed suit against Debtor for asbestos related property damage.[157] Recovery was sought on the theories of negligence, strict liability, implied warranty, express warranty, negligence, fraud and conspiracy. The Archdiocese alleged ACM manufactured by Debtor was installed in approximately 300 of their buildings. The ACM included ceiling tiles, pipe and boiler insulation, and other spray-applied materials. The action was ultimately stayed as to Debtor because of the filing of this bankruptcy.

Mr. Michael Jones, chief financial officer to the Archdiocese of St. Louis whose responsibilities included overseeing the director of the Archdiocese [Asbestos] Compliance Office, testified on behalf of Debtors.[158] According to Mr. Jones, an operations and management plan ("O & M") was put in effect requiring an inspection for asbestos in all 1100 buildings owned by the Archdiocese.[159] During the required inspection the asbestos containing products were identified. Debtor's products were specifically identified through dust sample analysis and visual identification of Debtor's logos on certain products.[160]

According to Mr. Jones, there were continuous episodes of asbestos fiber release throughout the buildings. Mr. Jones gave several examples of types of activities or disturbances that resulted in fiber release. Roof leaks, water leaks from bursting pipes, ceiling fans vibrating ceiling tiles, and students throwing pencils or other objects into the ceiling tiles were typical causes of fiber release. Mr. Jones also testified about a particular problem situation occurring when

154. *See* Compl. filed in State of Ohio v. Celotex Corp. No. 84–565 (C.P.Ct., Stark County, Ohio filed April 13, 1994). (Debtor's Ex. 1384 at 1, 4).

155. Debtor's Ex. 1398 at 2.

156. *Id.*

157. *See* Compl. filed in John L. May Archbishop v. AC & S, Inc., No. 88–0386–C–5 (E.D.Mo. filed Feb. 29, 1988). (Debtor's Ex. 909 at 1, 3).

158. Phase I Tr. at 3434–3435, 3448–3450 (June 11, 1993) (Jones testimony).

159. *Id.* 3459–63.

160. Phase I Tr. at 5106–07 (Dec. 9, 1993) (Hatfield testimony).

a pastor, so determined to rid his school of the asbestos material, instituted self help methods to tear out the ACM.[161] The pastor and his maintenance crew, with haste and determination, went into one of the multi-use buildings in the school and with a linoleum knife slit open all the pipe wrap encasing the ACM in the ceiling. The ACM fell 20 feet to the ground, creating a large cloud of dust. As a result the building was shut down for three months while the asbestos could be removed properly.[162] There was also an episode where a pastor took it upon himself, with the help of a jackhammer, to replace asbestos containing floor tiles in a school gymnasium.[163]

Mr. Hatfield was retained by the Archdiocese to inspect their buildings in conjunction with litigation against asbestos manufacturers, including the Debtor.[164] During his inspection, he testified he observed various conditions of the asbestos products, finding damaged thermal insulation, ripped and gouged pipe insulation, water damaged ceiling tiles, and general deterioration in certain areas.[165] In addition to his observations, Mr. Hatfield also directed dust samples taken in certain areas using the microvac method.[166] The dust samples were analyzed by Dr. Longo and the results, Hatfield concluded, indicated the asbestos found in the samples was released from Debtor's product. Hatfield also testified the surfaces tested were significantly contaminated with asbestos fibers.[167] Notwithstanding the alleged contamination, according to the evidence ACM remains in the Archdiocese building at the time of this trial.[168]

161. *Id.* at 3467–72.

162. *Id.*

163. *Id.* at 3472.

164. Phase I Tr. at 5105 (Dec. 9, 1993) (Hatfield testimony).

165. *Id.* at 5122–33.

166. *Id.* at 5122, 5133–34.

167. Phase I Tr. at 5137 (Dec. 9, 1993) (Hatfield testimony). Debtor's Ex. 1528.18.

168. Phase I Tr. at p. 5105–07 (Dec. 9, 1993) (Hatfield testimony).

8. St. Joseph's Hospital

In 1986 St. Joseph's Hospital in Augusta, Georgia filed a suit against Debtor seeking recovery on theories of restitution, negligence, breach of express warranties, breach of implied warranties, and fraud and misrepresentation.[169] A jury verdict was returned against Debtor for $300,000. The verdict was ultimately overturned on appeal based on statute of limitations grounds.

At trial it was established that Spraycraft, a spray-applied fireproofing product containing asbestos, was installed in certain areas of the hospital during 1969–1970. Spraycraft was manufactured by Debtor.[170] Dr. Dale Keyes and Richard Hatfield testified at trial on behalf of building owners in the underlying cases.[171] Dr. Keyes performed an inspection of the building and Mr. Hatfield conducted or directed to be conducted dust sampling.[172] The dust samples demonstrated, according to Hatfield, substantial contamination of surfaces in the areas sampled.[173]

Further testimony indicated most of the asbestos material was ultimately removed in compliance with government regulations when a renovation project was undertaken by the hospital.[174] Notwithstanding the renovation project, some asbestos still remains in the elevator shafts of the building.

E. *Summation of the Evidence Concerning the 8 Representative Cases*

Debtor put on evidence of the damage to property alleged in the underlying actions. According to Debtor's evidence, ACM install-

169. *See* Compl. St. Joseph's Hosp. v. The Celotex Corp., No. CV186–047 (S.D.Ga., Augusta Div. filed March 10, 1986). (Debtor's Ex. 981 at 1).

170. Phase I Tr. at 5177 (Dec. 9, 1993) (Hatfield testimony).

171. Phase I Tr. at 5177 (Dec. 9, 1993) (Hatfield testimony).

172. *Id.* at 5178.

173. *Id.* at 5178–79.

174. *Id.*

ed in buildings has released, or will release, harmful asbestos fibers into the air, thereby creating a health hazard to building occupants. Debtor established through the evidence that its asbestos-containing materials were installed in certain buildings; asbestos fibers were released into the air due to natural aging and deterioration to the materials, or due to accidental or intentional disturbance of the materials; the asbestos fibers became airborne either when released or reentrained; and the airborne asbestos fibers were potentially hazardous to any human who might inhale the airborne fibers. Debtor also established there are government regulations which may require corrective action on the part of building owners if renovation of the building is undertaken, or the level of asbestos fibers exceeds certain mandated levels. The government regulations encompassed a wide spectrum of corrective action depending on the fiber level found to exist. Such actions could range from an operations and management program, to encapsulation, to complete removal of the ACM. The evidence also established there was ACM which, although still present in the buildings, was not friable at present.

In contrast, Defendants' experts testified in-place and undamaged ACM posed no threat to human life. Further, Defendants' experts testified exposure to low levels of asbestos fibers posed no health hazard. Evidence of government regulations was presented requiring or recommending removal, encapsulation, or other corrective measures if, in fact, airborne asbestos fibers reached certain levels. There was also evidence indicating despite the hue and cry of the immediate dangers of exposure to asbestos fibers at any level to building occupants, ACM still remain in most of the buildings. Further-

more, there was no evidence of asbestos-related diseases caused by inhalation of asbestos while occupying a building with ACM.

## IV. INSURANCE ISSUES

### A. *Types of Policies*

As stated previously, this adversary is concerned with insurance coverage for asbestos related property damage.[175] During the relevant period there were 240 policies in force of which 98 are at issue in this case.[176] These 98 policies were issued by 29 different companies.[177]

The insurance policies at issue are umbrella liability policies ("umbrella policies") and excess liability policies ("excess policies"). Debtor purchased insurance coverage in layers for each policy period. The first layer being comprehensive general primary liability insurance policies ("CGL" or "primary").[178] The second layer of insurance consists of umbrella policies which provide coverage for liability amounts in excess of the primary policies. Additional layers of liability coverage for amounts in excess of the umbrella policies are provided by the Excess Policies. To illustrate, during the policy period from October 1, 1977 to October 1, 1978, Debtor's primary policy carrier, Aetna provided products liability aggregate limits of $2 million dollars, in addition, Debtor purchased an umbrella policy from Northbrook which provided additional aggregate limit of $20 million dollars. Above the Umbrella Policy, Debtor purchased six separate Excess Policies from various insurers carrying additional aggregate limits of $30 million dollars. As a result, for the policy period

---

175. *Compare* Jerold Oshinsky, *Comprehensive General Liability Insurance: Trigger and Scope of Coverage In Long–Term Exposure Cases,* 17 **Forum** 1035 (1982) *with* John P. Arness & Randall D. Eliason, *Insurance Coverage for "Property Damage" in Asbestos and Other Toxic Tort Cases,* 72 **Va.L.Rev.** 943 (1986) (illustrating examples of opposing adversaries' general views of insurance coverage issues in asbestos cases).

176. Debtor's Ex. Nos. 365, 367–370 are representations of the policy numbers, policy periods,

policy limits and layers of coverage at issue in Phase I.

177. *See supra,* note 2 (containing a list of insurer Defendants). Notwithstanding there are 29 insurance companies, there are only 27 defendants because FIGA represents three companies.

178. Debtor's primary liability insurance carrier, Aetna Casualty & Surety Company, is not a party to Phase I.

described, Debtor had a total of $52 million dollars in general liability coverage.[179]

The Umbrella Policies generally contained standardized language used industry wide. The language contained in the Excess Policies "followed form" to the underlying Umbrella Policies or other underlying Excess Policies, unless expressly stated otherwise. Therefore, in an Excess Policy that "followed form", the terms, conditions, and exclusions of the Umbrella Policy were incorporated in the Excess Policy.

### B. Occurrence, Property Damage, Trigger of Coverage

"Occurrence" is a defined term in each of the policies.[180] To be covered under the policies, "Property Damage" must be the result of an event defined within the "Occurrence" clause. Both of these terms are critical in the analysis of whether insurance coverage is available to Debtor under the policies. Appendix B of the opinion is a chart identifying each "Occurrence" definition and the specific policy in which it is contained. All the definitions of "Occurrence" require the property damage to occur "during the policy period" and require the property damage to be unexpected and unintended. The majority of the policies define occurrence as ". . . an accident, event or happening including continuous or repeated exposure to conditions which results during the policy period in . . . Property Damage . . . neither expected nor intended from the standpoint of the Insured."

Although considered standardized, the language used by the insurers differs from policy to policy in certain provisions. In the 98 policies at issue, there are 9 different definitions of "Property Damage". Appendix C of

this opinion is a chart identifying each "Property Damage" definition and the specific policy in which it is contained. (See App. C.; Debtor's Ex. Nos. 391, 392, & 393). The majority of the policies contain a definition of "Property Damage" which requires it to be *physical injury to tangible property*. In view of all the policies at issue, those policies containing definitions of property damage which require the injury to be physical and to tangible property, are the most limiting in terms of coverage.[181]

### C. Exclusions

Defendants assert Debtor's claims are excluded from coverage under the policies, notwithstanding those claims may fall within the definitions of "occurrence" and "property damage" contained in the policies. Defendants have raised certain exclusions contained in the policies as defenses to coverage. Those exclusions are the 1) own-product exclusion; 2) sistership exclusion; 3) loss of use exclusion; and 4) pollution exclusion. Defendants also assert coverage is precluded based upon the known-loss doctrine and the expected or intended clause of the occurrence definition.

This Court previously ruled "[t]he 'own products' exclusion does not apply to the extent that Debtors' products are deemed to have damaged property owned by others;"[182] Likewise, "[t]he 'sistership' exclusion does not apply to damage caused by the policyholder's product to the property of third parties, or to damage to a final product caused by incorporation of the policyholder's product as an ingredient thereof. It only excludes coverage for the costs of withdrawing a product from the market;"[183] and, "The 'loss of use' exclusion does not apply to

---

179. See Debtor's Ex. No. 370 (displaying a chart depicting Debtor's insurance coverage from April 18, 1972, through October 1, 1984). The Court uses this example strictly for illustrative purpose—not to determine whether claims invade excess limits, or when or which policies apply.

180. There are some slight differences in the policies as to where the "arising out of an occurrence" requirement appears in the policies. This difference, however, is not relevant to the Court's determination of the issues before it.

181. See **Kenneth S. Abraham, Environmental Liability Insurance Law: An Analysis of Toxic Tort**

and **Hazardous Waste Insurance Coverage Issues** 80 (1991). Generally, policies dated pre–1973 did not contain the word "physical" in the property damage definition. *Id.* at 79. After 1973 the "physical" requirement was added to standard form policies thereby limiting coverage. *Id.* at 80.

182. Order on Mot. for Recons. Concerning Debtors' Mot. for Partial Summ.J., at 2 (November 3, 1992).

183. *Id.*

claims involving property damage, including the loss of use of damaged property. Thus, this exclusion [fails] to the extent that the underlying claims have alleged property damage as defined by the policies."[184] Having eliminated those exclusions as a bar to coverage, the Court considers the remaining defenses to coverage raised by Defendants; the pollution exclusion, the known loss doctrine, and the expected or intended clause found in the definition of occurrence.[185]

## V. LEGAL ANALYSIS

This Court considered, in addition to the evidence in this Phase I, the case law, law review articles, treatises, scientific journals, trade journals, and government publications cited by the parties, as well as many its own research has revealed, in search of definitive answers to the Property Damage coverage questions presented. Not surprisingly there were no definitive answers to the exact questions presented for various reasons. Much of the case law relied on by the parties dealt with insurance coverage for bodily injury as opposed to property damage. Moreover, the

cases cited were based upon scientific knowledge and experience now somewhat dated. Some of the policies considered by other courts contained language different from the language in the policies before this Court. Furthermore, the older policies considered had broader definitions than those contained in the more recent policies. Finally, the government regulations and promulgations in some cases were based upon dated scientific information or specific state statutes.

The Court prefaces its analysis with a brief explanation of the three important concepts contained in the insurance policies before it. These policies are known as "Occurrence" policies because coverage is based upon an occurrence regardless of when suit is brought alleging liability.[186] Property Damage, physical injury to tangible property, must be the result of an event. The event which must occur is an accident or repeated exposure to conditions which results in physical injury to tangible property. Also critical to this analysis is the concept of "Trigger of Coverage"[187]. To trigger coverage under a

184. *Id.*

185. *See* **Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes,** section 10.02 (1994) (discussing pollution exclusion and "unexpected or unintended" issues). The "known-loss" doctrine (also referred to by some as the known-risk doctrine) is a defense to coverage asserted on the grounds an insured knew of the risk that caused the harm at the time the CGL is purchased or on the grounds the loss was in progress at the time the CGL was purchased. **Abraham,** *supra* note 181, at 141–145.

186. *See* **Abraham,** *supra* note 181, at 91.

187. *See generally id.* There are four trigger of coverage theories generally accepted by commentators and discussed in cases dealing with determining when bodily injury, and to some extent to when property damage, occurs so as to trigger coverage under a comprehensive general liability policy. Those theories are (1) exposure, (2) manifestation, (3) continuous trigger and (4) injury-in fact.

Under the exposure theory, property damage occurs upon installation of asbestos. *See Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir.1980), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Porter v. American Optical Corp.,* 641 F.2d 1128 (5th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Commer-*

*cial Union Insurance Co. v. Sepco Corp.,* 765 F.2d 1543 (11th Cir.1985); *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* 842 F.2d 977 (8th Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); The manifestation theory defines property damage occurring at the time the damage manifest or is discovered. *See Eagle–Picher Indus. v. Liberty Mut. Ins. Co.,* 682 F.2d 12 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983); *Mraz v. Canadian Universal Ins. Co.,* 804 F.2d 1325 (4th Cir.1986); The continuous trigger approach defines property damage as occurring continuously from time of installation until the time of discovery. This approach generally provides the most insurance coverage as each policy in force during this continuing period could be triggered. *See Keene Corp. v. Insurance Co. of N. Am.* 667 F.2d 1034 (D.C.Cir.1981) *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 875 (1982); *Lac D'Amiante Du Quebec, Ltee. v. American Home Assur. Co.,* 613 F.Supp. 1549 (D.N.J. 1985), *vacated as to insolvent defendant only,* 864 F.2d 1033 (3d Cir.1988); And finally, the injury-in-fact trigger, sometimes referred to as damage-in-fact in the context of property damage. Under this approach coverage is triggered when the property damage underlying the claim actually occurs. *See American Home Prods. Corp. v. Liberty Mut. Ins. Co.,* 748 F.2d 760 (2d Cir.1984); *W.R. Grace & Co. v. Continental Cas. Co.,* 896 F.2d 865 (5th Cir.1990); *New York v. Amro Realty Corp.,* 697 F.Supp. 99 (N.D.N.Y.1988).

policy, an accident or repeated exposures to conditions must result in physical injury to tangible property *during the policy period.* Accordingly, the policy or policies in effect at the time the "Property Damage" "Occurs" provide(s) the coverage. Discussion in varying detail follows on the definitions of the terms, "Property Damage", "Occurrence" and "Trigger of Coverage" and how respective policies are considered by courts. Further, this Court has ruled that Illinois law is the applicable law to be applied to the interpretation of insurance coverage in this adversary proceeding.[188] Accordingly, this opinion is based upon this Court's view of Illinois law and its application to the issues being considered.

This Court previously ruled Debtor has the burden of establishing it is entitled to insurance coverage for asbestos-related property damage claims asserted against it by third parties.[189]

Furthermore, the Court ruled Debtor is not required to establish its own liability for any underlying property damage claims, rather Debtor is required to establish, through its representative cases, asbestos related property damage claims made against it by third parties are within the definition of property damage covered under Debtor's policies.[190]

■ Defendants assert Debtor did not meet its burden to prove entitlement on a duty to indemnify standard because it did not prove *actual facts of the underlying claims.* Defendants offer *C.H. Heist Caribe Corp. v. American Home Assurance Co.,* 640 F.2d 479, 483 (3d Cir.1981) in support of their

position. First, *C.H. Heist* must be distinguished as a duty to defend case vis an indemnification decision. In *C.H. Heist* the court states "an insurers's obligation to defend an action against the insured is not necessarily coextensive with its obligation to indemnify the insured. Different elements of proof are required to establish a breach with each obligation." [191] It appears the Defendants are confusing the issue of liability with the issue of coverage.[192] As previously stated, the threshold issue for this Court to decide is whether the asbestos related property damage asserted against debtors is the type of risk covered by the policies. The Court does not agree with Defendants' contention Debtor must *prove actual facts of liability* in as much as the determination made by this Court does not include whether there was in fact damage sustained by underlying claimants for which Debtor may be liable.

In *United States Gypsum Co. v. Admiral Insurance Co.,* 268 Ill.App.3d 598, 205 Ill. Dec. 619, 643 N.E.2d 1226 (1994), defendant insurers unsuccessfully argued the same point. In *Gypsum* the Illinois appellate court stated, "Irrespective of the quantum of proof necessary to establish property damage, Gypsum as an insured in a declaratory action, does not have to prove de novo the existence of damage in the underlying action, i.e. its own liability." [193] This Court has stated on numerous occasions and in a variety of ways Debtor is not required to *establish its own liability* for any asbestos related property damage claims asserted. In fact this Court may assume, for the purpose of making this decision, the underlying claimants sustained damage to their property resulting

**188.** *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.),* 194 B.R. 668, 673 (Bankr.M.D.Fla.1996).

**189.** *Celotex Corp. v. AIU Insurance Co., et al. (In re Celotex Corp.),* 152 B.R. 661, 665 (Bankr. M.D.Fla.1993).

**190.** *Id.*

**191.** *C.H. Heist,* 640 F.2d at 481 (citations omitted).

**192.** Courts have addressed this identical argument and have distinguished between the proof necessary to determine whether a duty to indemnify existed and whether liability existed. *See*

*Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1379 (E.D.N.Y.1988); *Servidone Constr. Corp. v. Security Ins. Co.,* 64 N.Y.2d 419, 488 N.Y.S.2d 139, 143, 477 N.E.2d 441, 445 (1985); and *Armstrong World Indus. v. Aetna Casualty & Sur.,* 26 Cal.Rptr.2d 35, 85 (Cal.Ct.App.1993).

**193.** *See also, Dayton Indep. Sch. Dist. v. Nat'l Gypsum Co.,* 682 F.Supp. 1403, 1406 (E.D.Tex. 1988) ("In determining whether the claim is within coverage, the nature of the third party's claim is determinative, and not the actual facts underlying that claim. A policyholder, therefore, does not have to prove its actual liability as a prerequisite to obtaining coverage.") (citations omitted).

from asbestos—and further assume Debtor may be liable to the building owners for those damages. These assumptions in no way affect whether Debtor has insurance coverage for those third party claims.

### A. *Pollution Exclusion, Known–Loss Doctrine, and Expected or Intended*

#### 1. Pollution Exclusion

■ Defendants assert the pollution exclusions contained in their respective policies preclude coverage for alleged property damage. The pollution exclusion contained in the domestic policies [194] under consideration excludes coverage for property damage arising out of:

the discharge, dispersal, release or escape of smoke, vapors, soot fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other *irritants, contaminants, or pollutants* into or upon land, the *atmosphere* or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental.*[195] (emphasis added)

The pollution exclusion can be viewed as containing two parts, one the exclusionary portion, and two, the exception to the exclusion. The exclusionary portion precludes coverage under CGL policies, the exception to the exclusion reinstates coverage.[196] In determining whether a particular claim is covered under a policy one first tests to see if the claim is excluded from coverage under the exclusionary clause, and if so, then look to the exceptions to the exclusions.[197]

The Illinois Supreme Court did just that in *U.S. Fidelity & Guaranty Co. v. Wilkin*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991). The *Wilkin* court, interpreting exclusionary language identical to the language in the instant case, held the pollution exclusion did not apply, and therefore, did not have to reach the issue of whether the exception to the exclusion applied.[198] The court opined the term "atmosphere", contained in the exclusion, referred to the external atmosphere and not to the "internal environs or surroundings of individual buildings." [199] In so holding the *Wilkin* Court did not need to decide whether the asbestos contamination was "sudden and accidental." [200] The court, although not citing to any specific authority for its reasoning, relied on the "ordinary popular meaning of the phrase "the atmosphere" [to connote] the external atmosphere which surrounds the earth and consists of the

---

**194.** The exclusions contained in the non-domestic policies are discussed separately in this opinion.

**195.** This pollution exclusion is contained in those policies identified as Debtor's exhibit numbers 73A & B, 85A & B, 89A & B, 121A & B, 72A, 72B.1, 72B.2, 84A, 90A, 90B.1, 90B.2, 149A, 167A, 209A, 106A, 108A, 111A, 119A, 124A, 133A, 138A, 151A, 169A, 123A & B, 173A, 157A, 176A, 197A, 152A, 157A, 208A, 237A, 132A & B, 135A, 146A & B, 147A & B, 153A & B, 154B, 155A, 164A, 164B.1, 164B.2, 165A & B, 172A, 173A & B, 174A, 178A & B, 181A, 180A, 179A & B, 188A, 189A & B, 190A & B, 191A & B, 192A & B, 193A, 206A & B, 210A & B, 203A & B, 204A & B, 199A, 202A, 198A & B, 203A & B, 200A & B, 211A, 212A, 195A & B, 219A, 220A & B, 221A, 222A & B, 223A & B, 224A, 235A & B, 238A & B, 228A & B, 233A & B, 230A, 232A, 234A, 231A, 239A, 240A, 226A & B.

**196.** See generally **Ostrager & Newman**, *supra* note 185, at section 10.02 (1994) (discussing pollution exclusion issues).

**197.** See *id.*

**198.** *Wilkin*, 161 Ill.Dec. at 287, 578 N.E.2d at 933. See also **Abraham**, *supra* note 181, at 145–150. In fact, it is not generally the exclusionary language contained in the pollution exclusion that is disputed, rather it is most often the exception to the exclusion language which is disputed.

**199.** *Wilkin*, 161 Ill.Dec. at 287, 578 N.E.2d at 933. The *Wilkin* court alternatively held the term "atmosphere" is subject to more than one reasonable interpretation and therefore is ambiguous at best. Because ambiguities are required to be held against the drafter (in this case, the insurer) the court held under this finding the pollution exclusion would not preclude insurance coverage.

**200.** *Wilkin*, 161 Ill.Dec. at 280, 578 N.E.2d at 926. *But see Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 705–07, 607 N.E.2d 1204, 1218–20 (holding by the Illinois Supreme Court that determined the sudden and accidental exception to the pollution exclusion was ambiguous because it was subject to more than one reasonable meaning—abrupt, unintended or unexpected).

air and any gases or particles therein." [201] The court further reasoned that its interpretation was especially true when the word "atmosphere" was read in its context and in conjunction with the surrounding words contained in the exclusion.[202] Moreover, the court, quoting from the exclusion clause, stated, "When the clause "into or upon land, the atmosphere or any water course or body or water" is read as a whole, as it must be, it is readily apparent that the pollution exclusion applies to property damage arising from the discharge of pollution into the external environment or onto some part thereof, rather than the release of asbestos fibers within a building." [203]

As previously stated, the language contained in the domestic policy pollution exclusion clause is identical to the language the *Wilkin* court considered. Given that fact, and the fact this Court has previously ruled Illinois law is the governing law of these insurance contracts, the Court necessarily finds the pollution exclusion clause contained in the domestic policies is not applicable to Property Damage claims resulting from the release of asbestos fibers into buildings.

■ The remaining non-domestic policies contain the following language and exclude coverage for:

(1) Personal Injury or Bodily Injury or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that this paragraph (i) shall not apply to liability for Personal Injury or Bodily Injury or loss of

use of such property damaged or destroyed, where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance.

(2) The cost of removing, nullifying or cleaning-up seeping, polluting or contamination substances unless the seepage, pollution, or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance.[204]

The pollution exclusion contained in the non-domestic policies appear on their face broader in scope than their domestic counterpart. They do not limit the exclusion to releases occurring "into or upon land, the atmosphere, or any water course or body of water".[205] Like the domestic policies, however, they do contain an exception to the exclusion. The exception reinstates coverage if the "pollution, or contamination is caused by a *sudden, unintended and unexpected happening* during the period of th[e] insurance." [206]

■ This Court is unaware of any cases where Illinois law is applied interpreting policies which contain a pollution exclusion identical to those contained in the non-domestic policies.[207] In light of the absence of cases construing exactly this provision, this Court looks to Illinois cases construing similar provisions as well as the general principles of insurance contract construction.[208] Insurance contracts which contain words that are unambiguous must be given their plain, ordi-

---

**201.** *Wilkin*, 161 Ill.Dec. at 287, 578 N.E.2d at 933.

This Court has previously addressed the issue of defining "atmosphere" under Illinois law. *See* Memorandum Order on Debtor's Mot. for Entry of Partial Summ.J. on the Pollution Exclusion, at 2 (October 11, 1994).

**202.** *Wilkin*, 161 Ill.Dec. at 287, 578 N.E.2d at 933.

**203.** *Id.*

**204.** This language is contained in those policies identified as Debtor's exhibit number 56A & B, 57A & B, 61A & B, 122A, 136A, 150A, 156A & B, 168A, 170A, 194A, 225A, 153A & B, 173A & B, 178A & B, 198A & B, 206A & B, 229A & B, 235A & B.

**205.** *Id.*

**206.** *Id.*

**207.** None of the parties cite to any Illinois cases interpreting the non-domestic exclusions being considered by this Court. *See* Debtor's Proposed Findings of Fact and Conclusions of Law; Defendants' Joint Proposed Findings of Fact and Conclusions of Law; Defendant Florida Insurance Guaranty Association Inc.'s Supplemental Finding of Fact and Conclusions of Law; Plaisted London Market Defs.' Additional Proposed Findings of Fact and Conclusions of Law with Regard to Phase I of the Adversary Proceeding (Pollution, Seepage and Contamination Exclusion Issue); and respective responses thereto.

**208.** *See* **Abraham**, *supra* note 181, at 26–29.

nary, and popular meaning.[209] On the other hand, contracts containing words which are ambiguous—susceptible to more than one reasonable meaning—must be construed in favor of the insured.[210]

The pollution exclusion clauses contained in the non-domestic policies do not limit it exclusion to discharges occurring *into or upon land, the atmosphere or any watercourse or body of water.* The policies make no reference to where the discharge of the pollutant, contaminate, etc. must take place. Therefore, because the limiting language does not exists in the non-domestic policies, the exclusion does apply and this Court must now determine if the "sudden, unintended and unexpected happening" exception negates this exclusion.

It is this exception to the exclusion clause that make up a majority of the disputes in environmental liability insurance coverage disputes.[211] The dispute hinges on the meaning of the phrase sudden and accidental. Courts have interpreted the term sudden to have a temporal meaning. Other courts have viewed the use of the word sudden when used in conjunction with accidental, to not require a temporal meaning; interpreting sudden to mean "unexpected". Moreover, courts have held the term sudden is susceptible to more than one reasonable meaning and, therefore, ambiguous.[212]

The Illinois Supreme Court in *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992), considered the "sudden and accidental" exception to the pollution exclusion contained in policies and found the term "sudden" to be ambiguous.[213] In *Out-*

*board Marine* the insured sought a determination for coverage under CGL insurance policies for damages resulting from its discharge of polychlorinated byphenyls (PCBs) into the North Ditch, Waukegan Harbor, and Lake Michigan. On appeal, the insured contested the lower appellate court's holding that the pollution exclusion contained in the policies barred coverage. The exclusion considered by the court provided

This insurance does not apply ... to ... property damage arising out of the discharge, dispersal ... release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere of any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal release or escape is sudden and accidental.*[214]

The issue for the court's determination was whether the insured's releases of PCBs into the various waterways were "sudden and accidental".[215] If the court found the releases of PCBs to be sudden and accidental, coverage for the releases would be reinstated under the exception to the pollution exclusion clause.[216]

The court determined the term "sudden" as used in the pollution exclusion exception was ambiguous and held that it meant unexpected or unintended.[217] The court considered the fact that numerous dictionaries defined "sudden" to mean happening unexpectedly, without notice or warning, or unforeseen, and the same dictionaries defined

---

209. *Wilkin*, 161 Ill.Dec. at 284, 578 N.E.2d at 930.

210. *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992); *Wilkin*, 161 Ill.Dec. at 284, 578 N.E.2d at 930. *See also*, **Abraham**, *supra* note 181, at 26–29 (discussing *contra proferentum*, the maxim which summarizes the most prominent rule of construction in insurance law—ambiguities in a document are to be construed against the drafter); **Ostrager & Newman**, *supra* note 185, at section 1.03.

211. **Abraham**, *supra* note 181, at 147.

212. *See, e.g., Outboard Marine*, 180 Ill.Dec. at 704–07, 607 N.E.2d at 1217–20.

213. *Outboard Marine*, 180 Ill.Dec. at 705, 707, 607 N.E.2d at 1218, 1220.

214. *Id.*, 180 Ill.Dec. at 704, 607 N.E.2d at 1217 (emphasis added).

215. *Id.*

216. *Id.*

217. *Id.*, 180 Ill.Dec. at 705, 607 N.E.2d at 1218.

sudden to mean abrupt, rapid, or swift.[218] Moreover, the court looked to the division among various courts throughout the country over the meaning of the term "sudden" in the same context.[219] The court rejected the insurers' contentions that the court's definition of sudden renders the use of the word mere surplusage.[220] In its view, to define sudden to mean abrupt would create a contradiction within the policy because the term accident is defined in the policies to include continuous or repeated exposures.[221] Furthermore, the court was not persuaded by the insurers surplusage argument because as it stated

> ... insurance policies are filled with words which overlap and complement each other. For example, with the pollution exclusion provision itself, the policies read: "discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants ..." (Emphasis added.) These words all add contours to the general concepts of a release of an environmentally toxic pollutant. It is not uncommon for provisions to appear in policies in this fashion. Faced with this common fact, we find the insurers' surplusage argument to be without merit.[222]

In view of the Illinois Supreme Court's holding in *Outboard Marine*, it is this Court's opinion the term "sudden" as used in the non-domestic policies is ambiguous and therefore must be construed in favor of the insured. The pollution exclusion contained in the domestic and non-domestic policies, under Illinois law, does not exclude coverage under the policies construed in Phase I.

### 2. Known–Loss Doctrine

■ The known loss doctrine is a defense raised to bar coverage for losses the insured knows of at the time the insurance is purchased.[223] Although the known loss doctrine is not an exclusion, its effect is to limit coverage and therefore it is generally discussed in this context.[224] The known loss doctrine arises out of the fundamental principle of fortuity.[225] This doctrine enforces the fortuity requirement by preventing coverage when the insured knows about the liability for a loss when an insurance policy is issued.[226]

Defendants contend coverage is precluded for property damage claims under all policies issued after September 30, 1981 or alternatively, for all claims under policies issued in October 1982 and later. In support of these contentions Defendants point to evidence admitted which purports Debtor had knowledge asbestos related property damage claims would be made against it prior to the purchase of the policies in September 1981. According to the Defendants, these events—the first asbestos related property damage claim filed by Cinnaminson, New Jersey Board of Education in May 1980, the Evandale complaint filed April 27, 1981 naming Debtor as a

**218.** *Id.*, 180 Ill.Dec. at 706, 607 N.E.2d at 1219.

**219.** *Id.*, 180 Ill.Dec. at 705, 607 N.E.2d at 1218.

**220.** *Id.*, 180 Ill.Dec. at 706, 607 N.E.2d at 1219.

**221.** *Id.* The policies at issue in Outboard Marine were occurrence based policies and defined occurrence as "an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." *Id.*

**222.** *Id.*, 180 Ill.Dec. at 707, 607 N.E.2d at 1220.

**223.** Abraham, *supra* note 181, at 141; **Ostrager & Newman**, *supra* note 185, at section 8.02[c]. The Loss in progress is a corollary rule to the known loss doctrine and precludes coverage if a policy is issued after manifestation of the loss. *See* **Abraham**, *supra* note 181, at 144–45.

**224.** *See* **Abraham**, *supra* note 181, at 130. In the 1966 and 1973 standard-form GCL occurrence policies, occurrence was defined as:

> an accident, including injurious exposure to conditions, which results, during the policy period, in *bodily injury or property damage neither expected nor intended from the standpoint of the insured.*

*Id.* (emphasis in original). Subsequently, in the 1986 revision of the standard-form CGL policy, the *expected or intended* language was deleted from the occurrence definition and added as an exclusion. *Id.*

**225.** *Outboard Marine*, 180 Ill.Dec. at 696, 607 N.E.2d at 1209; **Ostrager & Newman**, *supra* note 185, at section 8.02[c].

**226.** **Ostrager & Newman**, *supra* note 185, at section 8.02[c].

defendant,[227] and *The Attorney General's Asbestos Liability Report to the Congress* issued on September 21, 1981—pinpoint a time when Debtor became aware of asbestos-related property damage claims.

■ This Court does not view the known-loss doctrine as broad in scope as is suggested by Defendants. This Court is of the view, under Illinois law, Defendants must show Debtor had reason to "know there was a *substantial probability* of the loss at the time the policy was purchased."[228] In *Outboard Marine* the Illinois Supreme Court addressed the known loss doctrine on a motion for summary judgement which it remanded to the lower court with the instructions

> "...the insurers need not prove that [the insured] knew or had reason to know of the exact nature and extent of the PCB loss or that the PCB loss or liability was certain to occur ... Rather, the known loss doctrine may be invoked if the insurers demonstrate that [the insured] knew or had reason to know, at the time it purchased the CGL policy, that there was a substantial probability that loss or liability would ensue due to the PCB contamination for which it was seeking coverage. The question is not whether [the insured] knew it was discharging a pollutant into the environment ... Rather, the relevant question is whether [the insured] knew or had reason to know that a probable loss or liability would occur due to the PCB contamination alleged in the underlying complaints."[229]

On the evidence presented, the Defendants have not established Debtor knew there was a substantial probability it would be held liable for damage to property resulting from the release of asbestos fibers from its products.

### 3. Expected or Intended

■ The Court now turns to the expected or intended clause contained in the occurrence definition contained in the policies. This Court previously considered the appropriate standard under Illinois law when determining whether an insured expected or intended damage which results from its actions.[230] In that opinion, this Court held under Illinois law, for those policies containing an exclusion for coverage for asbestos-related property damage expected by the insured, coverage is not available if the Debtor committed an act which results in damages which were *intended* or *reasonably anticipated* by the Debtor.[231] In so holding, this court relied on *Bay State Ins. Co. v. Wilson.*[232]

■ The *Bay State* decision and subsequent Illinois decisions relating to the "expected and intended" exclusion all involved intentional torts. Thus, it was rather simple for those courts to establish either the intention of the tort feasor, or the fact the tort feasor should have expected a result from the intended act. Nonetheless, it is quite clear, in order for the exclusion to apply the evidence must establish the Debtor's acts resulted in physical injury to tangible property, and such injury was intentional or reasonably anticipated. Considering the evidence relating to the eight representative cases, and the additional evidence provided by the Defendant insurance companies,[233] this Court determines there is no evidence of an intentional act by the Debtor in the manufacture, sale, distribution, or installation of asbestos which would indicate any intent to injure any claimant. As the Seventh Circuit noted in *Calvert Insurance Co. v. Western Insurance Co.,* 874 F.2d 396 (7th Cir.1989), even an intentional act by the debtor would not preclude policy

**227.** Phase I Tr. at p. 453 (May 21, 1993) (Meserve testimony).

**228.** *Outboard Marine,* 180 Ill.Dec. at 698, 607 N.E.2d at 1211.

**229.** *Id.*

**230.** *Celotex Corp. v. AIU Insurance Co., et al. (In re Celotex Corp.),* 152 B.R. 652, 658 (Bankr. M.D.Fla.1993).

**231.** *Id.*

**232.** *Bay State Ins. Co. v. Wilson,* 96 Ill.2d 487, 71 Ill.Dec. 726, 451 N.E.2d 880 (1983).

**233.** Defendant insurance companies bear the burden of proof as regards the exclusion. *See St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.,* 146 Ill.App.3d 107, 100 Ill. Dec. 111, 113, 496 N.E.2d 1176, 1178 (1986).

coverage if it (intentional act) causes an unexpected and unintended result. *Id.* at 398. The record is devoid of any evidence the Debtor, by placing asbestos-containing material into the market place, could reasonably anticipate or expect the property damage which has been reflected herein. In fact, the evidence suggests, at best, there might be speculation across a broad spectrum of the industry and the insurance community in 1981 that asbestos in buildings was a concern to others, to some extent this is discussed as to the known loss doctrine. However, there is no evidence through the policy periods considered herein that the Debtor was either aware of or that there was a probability there would be property damage either at the time the asbestos was put in the market place, the policies were purchased, or the alleged "occurrences" under Illinois law took place. As has been duly noted by others, the issue is not foreseeability of the insured.[234] *See also,* John P. Arness & Randall D. Eliason, *Insurance Coverage for "Property Damage" in Asbestos and Other Toxic Tort Cases,* 72 **Va.L.Rev.** 943, 969 n. 2 (1986). As the supreme court of Illinois stated in *Bay State:*

> The terms "intended" or "expected" included in such clauses have not been treated as synonymous. Otherwise, no purpose would be served by including them within the clause. A greater degree of proof is required to establish intent than to establish expectation. (citation omitted). Injuries which are of such a nature that they should have been reasonably anticipated by the insured are "expected" injuries.

71 Ill.Dec. 726, 728, 451 N.E.2d 880, 882; *Shelter Insurance Companies v. Smith,* 133 Ill.App.3d 635, 88 Ill.Dec. 752, 753, 479 N.E.2d 365, 366 (1985); *J. Roth Builders, Inc. v. Aetna Life & Casualty Co.,* 151 Ill.

App.3d 572, 104 Ill.Dec. 920, 503 N.E.2d 782 (1987).

Therefore, it is the finding of this Court from the evidence presented in Phase I the Defendants have failed to meet their burden of establishing by a preponderance of the evidence that asbestos property damage claims, as presented by the eight representative cases, were expected or intended by the Debtor.

### B. *Property Damage, Occurrence, and Trigger of Coverage*

■ The Illinois supreme court has considered issues concerning whether property damage occurred in buildings where asbestos containing material existed in two cases, one in the context of a motion to dismiss and the other in the context whether an insurer had a duty to defend.[235] In neither case did the Illinois supreme court address specifically the issue now being considered by this Court.

In *Board of Education v. A, C & S Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989), 34 school districts sued manufacturers and installers of asbestos containing materials for alleged property damage to the buildings resulting from the release of asbestos fiber into the buildings.[236] The issue on appeal before the Supreme Court was whether the 34 school districts sufficiently pleaded a cause of action to recover cost of removal and repair of asbestos containing material in the buildings.[237] The court ultimately ruled plaintiffs pleaded sufficient facts to maintain an action for strict liability, negligence, and negligent misrepresentation.[238]

In *Board of Education* the defendants argued plaintiffs tort causes of action based upon strict liability and negligence did not allege the required damage to property or

---

**234.** Abraham *supra* note 181, at 132.

**235.** *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.,* 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991) (ruling on duty to defend); *Board of Educ. v. A, C & S Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989) (ruling on a motion to dismiss).

**236.** *Board of Education,* 137 Ill.Dec. at 638, 546 N.E.2d at 583.

**237.** *Id.,* 137 Ill.Dec. at 639, 546 N.E.2d at 584.

**238.** *Id.* Other rulings were made with respect to other issues on appeal, however, those rulings are not relevant to the instant case.

The court did not rule whether the levels of friable asbestos in the buildings were harmful, its ruling was limited to whether the facts alleged in the complaint were sufficient to state a claim. *Id.,* 137 Ill.Dec. at 643, 546 N.E.2d at 588.

injury to persons.[239] Without such allegations, defendants contended plaintiffs suffered only economic losses—recoverable in a contract claim but not a tort claim.[240] The plaintiffs countered its allegations of contamination of its buildings with a toxic substance rendering them unsafe for normal use were sufficient to allege property damage.[241] The court stated "when a product is sold in a defective condition that is *unreasonably dangerous* to the user or consumer or to his property, *strict liability in tort is applicable to physical injury to plaintiff's property,* as well as to personal injury." *Board of Education,* 137 Ill.Dec. at 640, 546 N.E.2d at 585 (citing to its opinion in *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 751, 435 N.E.2d 443, 448 (1982)).

The facts in *Wilkin* were considered by the Illinois supreme court in the context of a duty to defend case.[242] The insured, Wilkin, installed insulation products from 1958–1970 in buildings under construction. For the years between 1964–1985 Wilkin was insured under comprehensive general liability insurance policies issued by various insurance companies.[243]

Wilkin was named as a defendant in numerous asbestos-related action brought by building owners who alleged, inter alia, property damage caused by the installation of asbestos containing materials in their buildings. Specifically, the underlying claimants alleged:

"asbestos-containing products were installed in the buildings.... that, upon deterioration of the asbestos-containing product itself or upon disturbance from an outside force, asbestos fibers are released into the air.... The asbestos fibers are of the size and shape that permit them to remain airborne for periods of time, settle, and

then become resuspended in the air to later settle at different locations throughout the buildings. Thus, the buildings and their contents (e.g., carpets, upholstery, drapery, etc.) are virtually contaminated or impregnated with the asbestos fibers, the presence of which poses a serious health hazard to the human occupants."

Wilkin looked to its insurers for coverage of the claims asserted by the building owners for property damage.

The policies at issue in *Wilkin* contained definitions of property damage which varied somewhat, however, the court used the "strictest definition of property damage" contained in the policies.[244] The policies at issue before the *Wilkin* court defined property damage as

1) physical injury to or destruction of tangible property, which occurs during the policy period, including the loss of use thereof at any time resulting therefrom.[245]

Further, the policies required property damage to result from an "occurrence".[246] Occurrence was defined in those policies as "an accident, including continuous or repeated exposure to conditions which result in property damage ... neither expected or intended from the standpoint of the insured." [247]

The insurance companies in *Wilkin* argued the underlying complaints did not allege property damage, rather they contended the allegations of the presence of health threatening asbestos-containing products only resulted in intangible economic losses.[248] The *Wilkin* court rejected the insurance companies argument citing to *Board of Education* and stated, "[t]his court, however, has already found ... asbestos fiber contamination

---

239. *Id.,* 137 Ill.Dec. at 639, 546 N.E.2d at 584.

240. *Id.*

241. *Id.*

242. *Wilkin,* 161 Ill.Dec. at 283, 578 N.E.2d at 929.

243. *Id.*

244. *Id.,* 161 Ill.Dec. at 285, 578 N.E.2d at 931.

245. *Id.*

246. *Id.,* 161 Ill.Dec. at 286, 578 N.E.2d at 932.

247. *Id.*

248. *Id.*

constitutes physical injury to tangible property, i.e., the buildings and their contents."[249]

Defendants argue *Board of Education* and *United States Fidelity & Guaranty Company v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991), require Debtor to prove asbestos fibers exists within a building at unreasonably dangerous levels to establish property damage. From *Board of Education*, Defendants deduce the presence of asbestos fibers in less significant quantities is insufficient to constitute Property Damage.

This Court does not read *Board of Education* to require a showing of a specific level of asbestos fiber concentration levels within a building to establish Property Damage as that term is defined in the insurance policies. Moreover, this Court does not agree *Board of Education* makes it clear the presence of asbestos fibers in certain "less significant quantities" does not constitute Property Damage. In *Board of Education* the court stated

> "We conclude that it would be incongruous to argue there is no damage to other property when a harmful element exists throughout a building or an area of a building which by law must be corrected and at trial may be proven to exist at *unacceptably dangerous levels.*" (emphasis added)[250]

Reading this statement in its context—a determination of whether a cause of action has been stated in a strict liability case—renders Defendant's argument without merit.

For the same reasons stated in the discussion of *Board of Education*, this Court does not agree with Defendant's contention *Wilkin* requires an unreasonably dangerous lev-

el of asbestos fiber must exist to establish Property Damage. This Court reads *Wilkin* to hold asbestos contamination constitutes *physical injury to tangible property* (as opposed to an intangible economic loss). The Court does not read *Wilkin* to require any certain level of asbestos fibers to constitute property damage. In fact, the *Wilkin* court ultimately found with respect to the duty to defend issue "In the instant action, the underlying complaints allege that the buildings and the contents therein were contaminated by toxic asbestos fibers. Therefore, the underlying complaints allege *physical injury to tangible property.* Thus, we find that the underlying complaints allege potentially covered property damage." (emphasis added).[251] No reference is made by the court to any level of contamination by toxic asbestos fibers required to allege property damage.[252] The *Wilkin* court's reference to its previous holding in *Board of Education* does not establish the requirement of unreasonably dangerous levels of asbestos fibers and accordingly this Court rejects Defendants' arguments.

Subsequent to *Board of Education* and *Wilkin,* an Illinois appellate court upheld the trial court's finding of a duty to indemnify the insured for third party property damage claims. *Gypsum,* 205 Ill.Dec. at 640, 643 N.E.2d at 1247.[253] The factual evidence and expert testimony in *Gypsum* were substantially similar to the instant case.[254] In *Gypsum* the trial consisted of eight specific cases to which the parties agreed, seven of which had settled and one was tried to verdict.[255]

The policies at issue in *Gypsum* contained definitions of "Property Damage" and "Occurrence" which, although not uniform, were substantially similar to each other.[256] "Oc-

**249.** *Id.*

**250.** *Id.,* 137 Ill.Dec. at 643, 546 N.E.2d at 588.

**251.** *Id.,* 161 Ill.Dec. at 286, 578 N.E.2d at 932.

**252.** *Id.*

**253.** At the time the parties to this case submitted their respective proposed findings of fact and conclusions of law the appellate court had not ruled. *See* Defendant's Joint Response to Debtor's Proposed Findings of Fact and Conclusions of Law at p. 20.

**254.** The *Gypsum* appellate opinion contained some excerpts from the evidence and testimony that came out at trial. *See, e.g., Gypsum,* 205 Ill.Dec. at 629, 643 N.E.2d at 1236.

**255.** *Id.,* 205 Ill.Dec. at 629, 643 N.E.2d at 1236.

**256.** *Id.,* 205 Ill.Dec. at 622, 643 N.E.2d at 1229. The Court characterized the policies depending on the date as either "accident policies" or "occurrence" policies. Generally, primary policies issued before 1961 and excess policies issued before 1959 were "accident policies." Primary

currence" was generally defined as "an accident, including a continuous or repeated exposure to conditions, which results, during the policy period, ... in property damage ... *neither expected nor intended from the standpoint of the insured.*" (emphasis added)[257]

"Property Damage" was defined in the policies as "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of the use thereof at any time resulting therefrom; or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."[258]

In *Gypsum*, the insured put on evidence to establish airborne asbestos fibers were released from asbestos containing material, or that previously released asbestos fibers, which had settled on surfaces, were reentrained into the building's air. Further, the insured proved the released or reentrained fibers caused a potential health hazard to the buildings occupants and therefore contaminated the building and the personal property contained in the building. And finally, as a result of this contamination, established there was damage to the building and its contents for which the insured was liable.

During the course of the trial, there was testimony concerning the condition of the asbestos containing material—eg. that it was friable; flaking off or delaminating; water damaged; or falling off in chunks and pieces. Evidence of the then current government regulations was introduced to establish the permitted levels of asbestos exposure in the

workplace promulgated by OSHA. There was also evidence of the health effects of asbestos to humans and the associated asbestos related diseases. Based on the evidence presented, the *Gypsum* trial court found "... that each of the underlying cases at issue in this proceeding involved property damage so as to entitle U.S. Gypsum to indemnification under the policies at issue in this case." *Gypsum*, 205 Ill.Dec. at 629, 643 N.E.2d at 1236 (quoting the trial court findings).

On appeal,[259] the insurer asserted that in order for the trial court to find property damage existed, the insured was required to show "... there was a certain level of released airborne asbestos fibers which were of respirable size".[260] In support of its argument, the insurer looked to Illinois Supreme Court decisions in *Wilkin*[261] and *Board of Education*[262] which it argued required the insured to prove respirable asbestos fibers existed at "unreasonably dangerous levels".[263] The appellate court disagreed with insurers and distinguished *Wilkin* and *Board of Education* as being cases which were not cases involving a determination of whether there was a duty to indemnify.[264] The court specifically distinguished *Board of Education* as being a strict liability case and found that the "unreasonably dangerous" standard was not a proper standard in an insurance coverage case.[265]

In affirming the trial court, the appellate court also noted although no finding of a specific level of contamination was made, the trial court did find the underlying buildings were contaminated by the release of asbestos fibers.[266] Given that finding the insurers

and excess policies issued after 1961 and 1959 respectively were generally "occurrence" policies.

257. *Id.,* 205 Ill.Dec. at 624, 643 N.E.2d at 1231.

258. *Id.*

259. Various issues were raised on appeal by the insured and the insurer, however, only those that are relevant are discussed in this opinion.

260. *Gypsum*, 205 Ill.Dec. at 631, 643 N.E.2d at 1238.

261. *Wilkin*, 161 Ill.Dec. at 280, 578 N.E.2d 926.

262. *Board of Education*, 137 Ill.Dec. at 635, 546 N.E.2d 580.

263. *Gypsum*, 205 Ill.Dec. at 632, 643 N.E.2d at 1239.

264. *Id.*

265. *Id.*

266. *Id.*

challenge to the trial courts finding of property damage was rejected.[267]

In the instant case, the excess policies under consideration contain substantially the same if not identical definitions of "occurrence" and "property damage". The Debtor established if ACM exists in a building, asbestos fibers can become airborne, either by natural forces or unnatural forces, and if so, can be inhaled by building occupants which may be hazardous to them.

This Court concludes under Illinois law, Debtor does not have to establish the release of asbestos fibers rose to a specific level. Based on the foregoing, the Court concludes the damage sustained by underlying claimants in the representative cases is physical injury to tangible property.

 *Gypsum* was the first Illinois Court to address the issue of trigger of coverage for asbestos property damage claims.[268] The *Gypsum* Court, in reversing the trial court's use of the "discovery trigger", decided the appropriate trigger of coverage in the context of a asbestos related property damage is a continuous trigger. In deciding the trigger issue, the *Gypsum* Court relied upon *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987). In *Zurich* the Illinois supreme court decided the trigger of coverage issue in the context of asbestos related bodily injury claims.[269]

The *Zurich* court recognized there could be more than a single event which would trigger coverage. According to *Zurich,* a triggering event can occur in a bodily injury case at the time of exposure, at the time of manifestation of a disease, and at any time the claimant suffers some sickness.[270] While the *Gypsum* Court acknowledged "bodily injury" and "property damage" are two distinct insurance concepts, it used a similar conceptual approach in reaching it decision.[271] The court likened the ". . . evolving nature of an

illness resulting from the exposure to asbestos." with ". . . property damage that results from the release of asbestos fibers and the reentrainment of asbestos fibers [being] a continuing process which necessarily occurs over multiple policy periods." [272]

The *Gypsum* Court was not persuaded by the insurers contention that insureds did not pinpoint or prove exactly when the asbestos releases occurred, so as to establish which policies were triggered. The Court opined the rationale of the continuous trigger was indeed based on the rationale it would be impossible for an insured to be able to pinpoint the exact time the release took place. Therefore a continuous trigger was appropriate.

In the instant case, like the insured in *Gypsum,* Debtor did not pinpoint the exact time of release or reentrainment in each representative case. However, Debtor did establish and the Court finds asbestos fibers were released and or reentrained in each of the representative cases.

The difficulty courts have experienced with Comprehensive General Liability Insurance (CGLI) policies as they are associated with asbestos claims is not found in the policy language, nor in the operative sections of the policy. These form policies, at least from 1966 to 1986, were coverage templates establishing continuity of coverage and consistent policy interpretation. The threshold litigation of asbestos claims and coverage under the CGLI policies concerned bodily injury. Under the general factual scenarios accompanying non-asbestos-related bodily injury claims, the causation, i.e., the accident and the injury, were simultaneous. Cause and effect came in one neat package—flour barrel falls on man, or scale at train station hits woman.

---

**267.** The *Gypsum* court refused to find the trial court's factual findings to be against the manifest weight of the evidence. *Id.*, 205 Ill.Dec. at 632, 643 N.E.2d at 1239.

**268.** *Id.*, 205 Ill.Dec. at 645, 643 N.E.2d at 1252.

**269.** *Zurich,* 112 Ill.Dec. at 684, 514 N.E.2d at 150.

**270.** *Id.*, 112 Ill.Dec. at 694, 514 N.E.2d at 160.

**271.** *Gypsum,* 205 Ill.Dec. at 646, 643 N.E.2d at 1253.

**272.** *Id.*, 205 Ill.Dec. at 650, 643 N.E.2d at 1257.

As to asbestos bodily injury claims, the difficulty arises because there is a hiatus between the claimant's encounter with asbestos and the onset of a particular disease associated with asbestos exposure. This factual anomaly required the adjudicator to determine when the insurance coverage was "triggered" under the policy occurrence language of the CGLI policy. Trigger is an event which requires the policy to provide coverage when there is a claim. The event— "accident" or "injurious exposure to conditions"—found in the occurrence language which triggered the coverage presented a problem because of the uniqueness of the various diseases associated with asbestos inhalation. Asbestos could be inhaled by a claimant in one decade, but no signs of illness appear for perhaps another decade. Over that period of time, the asbestos manufacturer, or mine operator or insulating company, could have gone through a number of insurance policies and mergers with varying coverage periods. If an asbestos bodily injury claim arose for an asbestos insulator, when was coverage triggered—when the first fiber was inhaled; when symptoms first manifested; or, when a disease was diagnosed? Depending upon which trigger of coverage theory a court adopted, a varied panoply of insurance policies may be available to compensate the injured party. *See UNR Industries, Inc. v. Continental Insurance Co.,* 682 F.Supp. 1434, 1448 (N.D.Ill. 1988). Ergo, a certain trigger may be more beneficial to a particular litigant than another trigger. For example, "[m]ost insurers prefer the manifestation approach because it fixes the occurrence of the bodily injury to the discrete point of manifestation, thus freeing insurers from covering the disease in its incipiency." Lori J. Khan, *Untangling the Insurance Fibers in Asbestos Litigation: Toward a National Solution to the Asbestos Injury Crisis,* 68 **Tul.L.Rev.** 195, 210 (1993) (citations omitted); *see also* Jerold Oshinsky, *Comprehensive General Liability Insurance: Trigger and Scope of Coverage in Long-Term Exposure Cases,* 17 **Forum** 1035 (1982) (discussing CGLI policy issues from the insured's perspective).

The Supreme Court of Illinois, faced with the question of which "trigger of coverage" theory to adopt in asbestos bodily injury litigation, formulated its own theory—a hybrid "continuous triple trigger".

[W]e hold that under the plain and unambiguous language of the policies at issue, the insurer must provide coverage of asbestos-related claims if the claimant in the underlying action suffered "bodily injury," "sickness" or "disease" during the policy period. "Bodily injury" takes place at or shortly after the time a claimant was exposed to asbestos and continues throughout a claimant's exposure to asbestos. Thus, an insurer that was on the risk during the time the claimant was exposed to asbestos must provide coverage. "Disease" takes place when it is reasonably capable of clinical detection and diagnosis. The determination of when a claimant's disease was reasonably capable of diagnosis must be made on a case-by-case basis. "Sickness" takes place at any time during which the claimant "suffers from a disordered, weakened or unsound condition" before the clinical manifestation of a disease. Whether and when a claimant suffered "sickness" must be determined on a case-by-case basis.

*Zurich Insurance Co. v. Raymark Industries, Inc.,* 118 Ill.2d 23, 112 Ill.Dec. 684, 695, 514 N.E.2d 150, 161 (1987). This decision is the penultimate predicate for deciding asbestos property damage claims under Illinois law.

An asbestos property damage claim is similarly distinguishable from the classic property damage claim. In classic property damage claims, the occurrence is normally evidenced by a direct cause and effect relationship. Put simply, the product incorporated into the property malfunctions, causing damage to the property. *Cf. Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.,* 218 Ill.App.3d 956, 161 Ill.Dec. 357, 364, 578 N.E.2d 1003, 1010 (1991); *Marathon Plastics, Inc. v. International Insurance Co.,* 161 Ill.App.3d 452, 112 Ill.Dec. 816, 822, 514 N.E.2d 479, 485 (1987); *Elco Industries, Inc. v. Liberty Mutual Insurance Co.,* 90 Ill.App.3d 1106, 46 Ill.Dec. 319, 324, 414 N.E.2d 41, 46 (1980). When incorporated into a building, asbestos, manufactured into

many products, rarely malfunctioned. When malfunction occurred, it was not as asbestos but as the product, e.g., thermal insulation material covering hot water pipes deteriorates significantly if the pipe springs a leak. The asbestos in the product absorbs great quantities of water adding to the weight of the material, ultimately causing an expansion of the asbestos which falls, with the pipe, to the ground at some point. Note, however, the thermal insulation deteriorated, not the asbestos. The insulation is now in another form—a wet lump on the floor. Upon drying out, the asbestos may become friable.

The classification of asbestos as a pariah in the bodily injury context immediately translated into predictions of similar unforetold catastrophe to humans exposed to asbestos found in buildings. Mass litigation was suggested (*Attorney General Report*, Debtor's Ex. No. 1023), and cases were filed. A major difficulty with asbestos property damage litigation was the absence of actual bodily injury caused by asbestos inhaled in the building.[273] Courts, having had significant direct involvement in developing analysis of insurance coverage questions in asbestos bodily injury claims, now had to translate those criteria into asbestos property damage terms *sans* sickness, disease, bodily injury being apparent. "Perhaps it is difficult, and may appear somewhat artificial, to fit a claim for asbestos damage within the framework which has been established for more traditional tort or contract actions. Indeed, the nature of the 'defect' and the 'damage' caused by asbestos is unique from most of the cases we have addressed." *Board of Education v. A, C & S Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580, 588 (1989). The judicial path of translating asbestos bodily injury coverage issues into asbestos property damage coverage has been narrow. The route would be no different for the Illinois courts except for the jurisdiction's unique theory of trigger of coverage. Because of the perceived crisis of asbestos in the public schools, the State of Illinois passed legislation requiring school boards to develop remedial measures to address the asbestos in all school buildings. *See id.*, 137 Ill.Dec. at 638, 546 N.E.2d at 583.

The school boards lacked funds to remediate, thus, they brought lawsuits against various asbestos manufacturers seeking compensation for the removal and repair costs associated with ACM in the buildings. Initially only tangential issues associated with motions to dismiss the various causes of action came before the Illinois supreme court. *See id.* Yet, the *Board of Education* court's observation of other courts' consideration of asbestos claims within the property context advanced the examination of the problem, but still only within the bodily injury arena. "The nature of the defect in these ACMs is the asbestos fibers, which are toxic and which, it has been determined, may, in certain circumstances, be harmful." *Id.*, 137 Ill.Dec. at 643, 546 N.E.2d at 588.

> It is alleged in these complaints that friable asbestos exists in plaintiffs' buildings and asbestos has been released throughout the schools. *We need not, in ruling on this motion to dismiss,* determine whether the amounts of friable asbestos which exist in the buildings are harmful. Our focus is to take as true the facts alleged in the complaints and determine whether they sufficiently state a claim.

*Id.* (emphasis added). With that said, the *Board of Education* court makes the following observation, ". . . it would be incongruous to argue there is no damage to other property when a harmful element exists throughout a building or an area of a building *which by law* must be corrected and at trial may be proven to exist at unacceptably dangerous levels." *Id.* (emphasis added). Thus, on a motion to dismiss a complaint alleging asbestos property damage, not insurance coverage, the Illinois supreme court acknowledged (1) asbestos fibers are toxic (2) asbestos fibers may "in certain circumstances, be harmful", (3) the amount of friable asbestos in a building which may cause harm is not determined however, there is surely property damage when asbestos *is required by law* to be removed, and there are allegations asbestos fibers exist at "unacceptably dangerous levels." *See id.*

---

**273.** From a litigation standpoint, product identification and the economic·loss doctrine were problematic for underlying plaintiffs in proving their asbestos property damage claims.

In the initial Illinois insurance coverage case addressing asbestos property damage, the Illinois supreme court was asked to decide whether an insurance company had a duty to defend under a CGLI policy for alleged asbestos property damage. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 282, 578 N.E.2d 926, 928 (1991). There was no evidence of liability, much less a determination of the insurer's duty to indemnify. Reviewing the policy language for occurrence, property damage, and physical injury to tangible property, juxtaposed with the allegations in the school boards' complaints alleging property damage, the court found a duty to defend. With the same incongruity espoused in the *Board of Education* case, the *Wilkin* court stated: "This court, however, has already found *asbestos fiber contamination constitutes physical injury to tangible property*, i.e., the buildings and their contents." *Id.*, 161 Ill.Dec. at 285, 578 N.E.2d at 931 (emphasis added). While this Court's reading of the *Board of Education* decision lacks the discernment of a finding of "physical injury to tangible property," *Wilkin* is the same court speaking to insurance coverage for asbestos building claims, albeit the *Wilkin* focus is on an insurer's duty to defend.[274] The burden thus fell on an intermediate appellate court to reconcile the *Zurich* decision's trigger of coverage in asbestos bodily injury cases with the Illinois Supreme Court's view of asbestos property damage in *Board of Education* and *Wilkin*.

In *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill.App.3d 598, 205 Ill. Dec. 619, 622, 643 N.E.2d 1226, 1229 (1994), the insured asbestos manufacturer brought a declaratory action seeking a determination of coverage as to asbestos building claims. The trial, conducted in similar fashion to Phase I, terminated with the court holding that "discovery" of asbestos was the trigger of coverage under the Occurrence language for property damage. The Illinois Intermediate appellate court rejected the use of the "discovery trigger".

> Both *Wilkin* and *Board of Education* recognize that the installation of asbestos containing materials and resulting release of fibers, can constitute a cognizable claim for property damage. Neither case, however, specifically establishes any requirements with respect to what an insured must prove in order to secure coverage for underlying property damage claims that are based on the installation of asbestos.

*Id.*, 205 Ill.Dec. at 632, 643 N.E.2d at 1239. Noting "sufficient levels" of asbestos fibers created a potential health hazard, the *Gypsum* court also stated property damage could reasonably be determined where there was a "likelihood" asbestos fibers would be released in the future, "necessitating immediate remedial action." *Id.*, 205 Ill.Dec. at 631, 643 N.E.2d at 1238.

The court in *Gypsum*, while observing the application of asbestos bodily injury triggers to asbestos property damage claims suggests incongruities, found there are conceptual indicators announced in *Zurich* which would allow the Illinois multiple continuous trigger to function as to property damage.

> First, *Zurich* recognized that injury could occur in multiple policy periods which were spread over a substantial period of time.

---

**274.** Some Illinois case law characterizes the *Wilkin* court's holding. *See, e.g., Diamond State Insurance Co. v. Chester–Jensen Co.*, 243 Ill. App.3d 471, 183 Ill.Dec. 435, 444, 611 N.E.2d 1083, 1092 (1993), stating,

[the *Wilkin* court] found under a similar policy that an "occurrence" was present when the insured installed asbestos insulation in a building. The court determined that the 'buildings and their contents ... are virtually contaminated or impregnated with asbestos fibers, the presence of which poses a serious health hazard to the human occupants' and that such a continuous exposure to the released fibers was an "occurrence" as defined by the insurance policies.

*Id.; Bituminous*, 218 Ill.App.3d 956, 161 Ill.Dec. 357, 361, 578 N.E.2d 1003, 1007 (1991) ("in *Wilkin* [referring to the intermediate appellate court decision of the *Wilkin* case, *United States Fidelity and Guaranty Co. v. Wilkin Insulation Co.*, 193 Ill.App.3d 1087, 140 Ill.Dec. 907, 550 N.E.2d 1032 (1990) *aff'd, Wilkin*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991)], the [appellate] court found a physical injury occurred to the school buildings because incorporation of asbestos into the schools physically altered the property in such a manner so as to render the *buildings harmful until abatement* procedures could be undertaken.").

Second, *Zurich* further recognizes that although the manifestation of the disease constituted a bodily injury, the precursor(s) to that manifestation, exposure and possibly sickness, were also bodily injuries that could trigger coverage under the policies.

*Id.* 205 Ill.Dec. at 646, 643 N.E.2d at 1253.

Recognizing, like all those who have participated in similar coverage litigation, "[t]he burden of proving exactly when property damage occurred would be virtually impossible," *id.* 205 Ill.Dec. at 649, 643 N.E.2d at 1256, the *Gypsum* court found the Illinois trigger of coverage was a continuum taking place over multiple policy periods.[275] *Zurich*'s continuous trigger utilized within the asbestos bodily injury context applies to asbestos property damage claims.

## VI. APPLICATION OF LAW TO FACTS

Notwithstanding the initial public alarm over perceived health hazards from asbestos in buildings, the evidence does not support a conclusion the mere presence of asbestos in the building is a per se health hazard to humans. Evidence establishes the initial philosophy of complete removal of asbestos was modified. Nonetheless, owners of buildings containing asbestos filed lawsuits against the Debtor and filed claims in the general bankruptcy case, claiming their buildings were injured by the presence of asbestos-containing products manufactured by Celotex.

This Court is now faced with the task of determining whether there is coverage for asbestos building claims under the standard occurrence language of the CGLI policies issued by the Defendants to Debtor. This Court is not required within this declaratory judgment action to determine the liability of the Debtor for asbestos building claims, nor whether the insurance companies must compensate the Debtor or claimants for such claims. This Court decides only the extent which the insurance policies provide coverage for Debtor's asbestos-containing products for asbestos building claims as established by Illinois law. The Court's determinations seek to encompass not only insurance coverage for asbestos in buildings, but to acknowledge that friable asbestos with its potential health hazard is not the only form of property damage linked with asbestos.

The Court makes the following general determinations:

■ 1. The mere presence of asbestos containing material (ACM) in a building is not physical injury to tangible property under the policy language.

2. The installation of ACM in a building is a trigger of coverage under the occurrence language of the policies herein. (Exposure, which is the date of installation)

3. Where there is only a presence of asbestos fibers circulating in the interior atmosphere of a building, this is not physical injury to tangible property. (Asbestos fibers appear naturally in the environment. There must be a threshold level of circulation and reentrainment, or courts will continuously be forced to quantify "contamination").

■ 4. Where levels of asbestos fibers circulating in the interior of the building exceeds levels of asbestos in the exterior ambient atmosphere, there is a potential health hazard to building occupants, and physical injury to tangible property is established. (quantifiable threshold of manifestation/sickness)

5. When levels of asbestos fibers circulating in a building's interior atmosphere exceed limits established by any governmental entity, there is physical injury to tangible property. (disease)

---

**275.** The *Gypsum* court states:

> Our decision is consistent with the basic principles announced in *Zurich* and *Wilkin*. The [Illinois] supreme court's use of a triple trigger in *Zurich* recognizes that multiple policy periods can be triggered by the evolving nature of an illness resulting from the exposure to asbestos. Similarly, our application of a continuous trigger recognizes that the property damage that results from the release of asbestos fibers and the reentrainment of asbestos fibers is a continuing process which necessarily occurs over multiple policy periods. The *Zurich* decision looks beyond the discreet event of the manifestation of the disease as the sole trigger.

*Gypsum*, 205 Ill.Dec. at 650, 643 N.E.2d at 1257.

6. If the levels of asbestos fibers in the building atmosphere are such that the owner must develop and use a maintenance program to ensure levels of asbestos fibers do not become potential health hazards or to reduce levels below governmental standards relating to asbestos fibers then there is physical injury to tangible property. (manifestation/sickness)

7. Where ACM is present in a building, physical injury to tangible property occurs when, through the normal use and occupancy of the building including reasonable remodeling or renovation, the law requires the asbestos to be removed, abated, or otherwise remedied. (disease)

8. Where any ACM installed in a building is disturbed, deteriorates, or is otherwise damaged through no fault of the building owner and such asbestos is required to be maintained, removed, abated, or otherwise remedied by law, there is physical injury to tangible property. (disease)

9. When any ACM is required to be removed, abated, or otherwise remedied to comply with existing law, there is physical injury to tangible property. (disease)

The specific determinations as to asbestos property damage and insurance coverage are supported by the evidence before this Court and Illinois law, as well as public policy considerations. The emphasis as to occurrence and asbestos property damage claims is on damage to property in contrast with bodily injury. At one point in the trial it was noted if the level of asbestos fibers in a building could cause bodily injury then the damage had surpassed "physical injury to tangible property." The evidence during Phase I of this trial establishes the existence of numerous types of asbestos-containing products installed in a huge expanse of structures and buildings. It does not necessarily follow that buildings containing non-friable ACM should be precluded from a claim against the Debtor and other asbestos manufacturers, nor that the Debtor should have no coverage for such claim if there is physical injury to tangible property in absence of bodily injury.

These determinations also recognize the public shift from endorsing the wholesale removal of ACM to the proper maintenance of existing ACM in a building. The shift was logical, if not perceptible. Like Swine Flu, the foreordained pandemic of asbestos bodily injury from inhalation by building occupants has not occurred. The building owners, especially school boards and other governmental entities, did not have the financial ability to accomplish the initial task of removal. Finally, the asbestos manufacturers and their insurance companies put up a fight which stalled most litigation. Notwithstanding this stalemate, asbestos remains in most buildings and the current philosophy promotes education, maintenance, and safety, not removal.

These determinations also seek to forestall the ability to obtain insurance coverage for claims without a concomitant response to the problem of asbestos in buildings. Courts have difficulty drafting standards for remuneration predicated on toxic products which cause acknowledged health hazards without assuring that the situation will be remedied. Courts may not always be able to require compensated claimants to spend their proceeds in a particular fashion. Courts, however, can surely determine in such cases under what terms the insurance coverage will be provided. It is one thing to allow car owners to receive insurance proceeds and not repair the vehicle, it is another to allow building owners to receive insurance proceeds because of installed ACM without seeking to have the asbestos problem ameliorated at the very least.

Bright lines also have their confusion.[276] On first reading, the discussions of trigger of coverage in *Zurich* where the court finds " '[b]odily injury' [as used in the insurance policy] takes place at or shortly after the time a claimant was exposed to asbestos and continues throughout a claimant's exposure to asbestos," *Zurich*, 112 Ill.Dec. at 695, 514 N.E.2d at 161, one could conclude with the

---

**276.** "So quick bright things come to confusion." **William Shakespeare, Midsummer Night's** **Dream**, act 1, sc. 1.

juxtaposition of "bodily injury" and "exposure," that an exposure to asbestos was an "occurrence". If so, then installation of asbestos would be a building's exposure, and thus "property damage". If this is the Illinois bright line, all participants in Phase I have toiled in vain. This is not the case.

The Illinois Supreme Court in *Zurich* was aware, as was the appellate court in *Gypsum,* of the insurance policy language and its interpretation. Similarly, they were cognizant of the variegation of asbestos bodily injury and property damage claims. These decisions described a higher level of occurrence for anticipated asbestos claims, while this Court starts at the lower threshold of anticipated occurrences. Neither the triggers nor the property damage determinations herein are inconsistent with the Illinois decisions.

 The gravamen of Phase I is the determination of PHYSICAL INJURY TO TANGIBLE PROPERTY. Such is the property damage threshold issue. It is this Court's holding that, at a minimum, physical injury to tangible property arises when the asbestos in the building is of such a nature that corrective action would be required.[277]

277. *See Del Posing v. Merit Ins. Co.,* 258 Ill. App.3d 827, 196 Ill.Dec. 335, 340, 629 N.E.2d 1179, 1184 (1994) ("Asbestos contamination of a building and its contents, requiring corrective measures was damage to the building—ergo, by

## VII. CONCLUSION

This Court concludes Debtor established physical injury to tangible property in each of the representative cases. Further the Court determines the policies, except where specifically stated otherwise, are not ambiguous. The exclusions found in the policies, under Illinois law, do not preclude coverage as herein determined. Any determination made herein does not determine the liability of the Debtor, nor effect the issues still present in phase four of this adversary.

Therefore, based upon the foregoing determinations, this Court concludes the Debtor established in each of the representative cases that the existence of asbestos containing material in the buildings is an Occurrence under the respective policies. Accordingly, the Defendant insurers are required to provide insurance coverage for Property Damage. The determinations herein are established to conform with the anticipated claims suggested by the evidence associated with the eight representative cases. Further, by developing threshold levels of trigger and property damage, it will eliminate or a least reduce the necessity to adjudicate coverage through extensive and laborious trials devoted to distinctions of minute scientific detail.

**DONE AND ORDERED.**

logical extension, physical injury to tangible property.")

APPENDIX "A"

CORPORATE HISTORY FLOW CHART

APPENDIX "B"

## "OCCURRENCE" DEFINITIONS *

Occurrence Property Damage

It is agreed that:

With respect to Coverage D [Property Damage] of the Insuring Agreements,

1. The phrase "caused by accident" is eliminated and replaced by the phrase "arising out of an occurrence"; and

2. The word "accident" as used elsewhere in the policy with reference to Coverage D is replaced by the word "occurrence"; and

3. The word "occurrence" means an unexpected event or happening which results in injury to or destruction of property during the policy period, or *a continuous or repeated exposure to conditions which result in injury to or destruction of property during the policy period,* provided the insured did not intend or anticipate that injury to or destruction of property would result. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

"[O]ccurrence" means an accident, including *continuous or repeated exposure to conditions, which result in* bodily injury or *property damage* neither expected nor intended from the standpoint of the insured.

The term "Occurrence", whenever used herein, shall mean an unexpected or unintended event, or *continuous or repeated exposure to conditions, which* unexpectedly or unintentionally causes *injury, damage or destruction during the policy period. All such exposure to substantially the same conditions existing* at or emanating from each premises location during the policy shall be deemed one occurrence.

The term "Occurrence" whenever used herein shall mean an accident or a happening or event or *a continuous or repeated exposure to conditions which* unexpectedly and unintentionally *results in* personal injury, *property damage* or advertising liability *during the policy period.* All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

"Occurrence" means an accident, event or happening including *continuous or repeated exposure to conditions which results, during the policy period.* In Personal Injury, *Property Damage* or Advertising Liability neither expected nor intended from the standpoint of the Insured. Assault and battery committed by, at the direction of or on behalf of any insured for the purpose of protecting the person or property of any Insured or of others shall be deemed to be an Occurrence. All such Personal Injury, Property Damage or Advertising Injury caused by one event or by continuous or repeated exposure to substantially the same conditions shall be deemed to result from one occurrence.

* This chart is a demonstrative aid; it was not admitted into evidence. However, all the insurance policies are in evidence.

KEY:

**BOLD** = "Property damage" definition found within this policy.

*ITALICIZED* = Follows form of underlying policy.

***BOLD/ITALIC*** = "Property damage" definition found within this policy. Policy also follows form to underlying policy.

**OCCURRENCE DEFINITION 1** = American K–234 2764

**OCCURRENCE DEFINITION 2** = Transportation CCP904–40–44
*Continental Casualty RDX893–79–25*
**Transportation CCP995–43–08**
*Continental Casualty RDX893–74–17*
**Transportation CCP248–30–85**
*Continental Casualty RDX177–84–94*
*Continental SRX 215–34–36*
*Continental SRX 319–68–11*
*Continental SRX 319–69–95*
*Continental SRX 189–14–12*

**OCCURRENCE DEFINITION 3** = Continental Casualty RDU 9910226

**OCCURRENCE DEFINITION 4** = **Lloyd's 739/A22584**
**Lloyd's DN604208**
*Lloyd's DN604209*
*Lloyd's DN604210*
*Lloyd's DN604211*
**Lloyd's CU 6002**
*Lloyd's CU 6006*
*Lloyd's CU 6003*

**OCCURRENCE DEFINITION 5** = *National Union 1189777*
*National Union 1189778*
*First State 924634*
*First State 924635*

**INSURER & POLICY NUMBER**

**OCCURRENCE DEFINITION**

**Group A:**

FIRST STATE 925783
FIRST STATE 925784
COLUMBIA CASUALTY
 RDX 416–93–97
LLOYD'S 614/NC6080
AMERICAN EXCESS
 EUL 5002620

With respect to Coverage 1(a) and 1(b) "occurrence" means either an accident or happening or event or *a continuous or repeated exposure to conditions which* unexpectedly and intentionally *causes injury to* persons or *tangible property during the policy period.* All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

**Group B:**

FIRST STATE 925783
NATIONAL UNION
 1226411
LLOYD'S 614/NC8106
AMERICAN EXCESS
 EUL 5003854
FIRST STATE 928158

**Group E:**

EMPLOYERS/WAUSAU
 5733–00–300103
FIRST STATE 933188
TRANSIT SCU95633
HIGHLANDS SR 40905
NATIONAL UNION
 9602859
LLOYD'S 614/NTB082
MIDLAND XL739171
AMERICAN EXCESS EUL
 5097481
LEXINGTON 5524913
AIU 75101718
CALIFORNIA UNION ZCX
 00 63 71
EMPLOYERS MUTUAL
 MMMW 72069
PROTECTIVE NATIONAL
 XUB 180–70–09
CENTRAL NATIONAL
 CNZOO–80–94
INTEGRITY XL 50 01 78
TWIN CITY TXS 101244
FEDERAL 7936–52–23
GRANITE STATE 6–682–
 3764
INA XCP 143929
HARTFORD 83 XS 102629
NATIONAL SURETY XLX
 148–25–93

Group A) U.S. Fire 5230228122 (10/01/78—10/01/79);
Group B) U.S. Fire 5230758627 (10/01/79—10/01/80);
Group C) International 5230718118 (10/01/80—10/01/81);
Group D) International 523 1254329 (10/01/81—
 10/01/82);
Group E) International 523–252321 (10/01/82—10/01/83); and
Group F) International 523–252321 (10/01/83—10/01/84).

**Group C:**

EMPLOYERS/WAUSAU
 5731–00–300103
LEXINGTON 55–40–631
LLOYD'S 614/NTA234
FIRST STATE 930326
TRANSIT SCU 955684
EMPLOYERS/WAUSAU
 5731–00–300113
NATIONAL UNION
 1226062
LLOYD'S 614/NTA244
AMERICAN EXCESS
 EUL 5075895

**Group D:**

EMPLOYERS/WAUSAU
 5732–00–300103
LEXINGTON 5570052
LLOYD'S 614/NTA700
FIRST STATE 932702
TRANSIT SCU956 054
NATIONAL UNION
 118 5371
LLOYD'S 614/NTA701
NATIONAL UNION
 1185372
AMERICAN EXCESS
 EUL5084796
MIDLAND XL724609
HIGHLANDS SR40746
OLD REPUBLIC OXZ
 11573
NATIONAL SURETY
 XLX–148–24–29

**Group F:**

EMPLOYERS/WAUSAU
 5734–00–300103
FIRST STATE EU 000 580
TRANSIT SCU 956609
HIGHLANDS SR 41122
NATIONAL UNION
 9605640
LLOYD'S 614/NTB522
MIDLAND XL 739261
AIU 75–103564
ROYAL ED 102143
EMPLOYERS MUTUAL
 MMMW–72120
PROTECTIVE NATIONAL
 XUB 180–70–47

CENTRAL NATIONAL
CNZOO–8431
INTEGRITY XL 50 01 78
TWIN CITY TXS 101244
GRANITE STATE 6683–
4163
INA XCP 155830
HARTFORD 83 XS 103453
NATIONAL SURETY XLX–
153–01–19

## APPENDIX "C"

### DEBTORS' EXHIBIT 393

### PROPERTY DAMAGE DEFINITIONS
### CONTAINED IN OR FOLLOWED BY POLICIES AT ISSUE

The term **"Property Damage"** is not defined. The insuring agreement covers liability "because of injury to or destruction of property, including the loss of use thereof, caused by an occurrence."

The term "Property Damage", whenever used herein, shall mean direct or consequential damage to or destruction of tangible property including the loss of use thereof.

The term "Property Damage", wherever used herein shall mean the loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured).

"Property Damage" shall mean loss of or direct damage to or destruction of tangible property (other than property owned by any insured) and which results in an Occurrence during the policy period.

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed providing such loss of use is caused by an occurrence during the policy period.

[The term **"Property Damage"** is defined in the insuring agreement.] Property Damage Liability. For damages, because of physical injury to or destruction of or loss of tangible property caused by an occurrence.

(k) "Property damage" means (1) physical injury to or destruction of tangible property including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed, provided such loss of use is caused by an occurrence during the policy period.

"Property damage" means physical injury to, destruction of or loss of use of tangible property.

### DEBTORS' EXHIBIT 392

| INSURER & POLICY NUMBER | PROPERTY DAMAGE DEFINITION |
| --- | --- |
| American K–234 2764 | The term "Property Damage" is not defined. The insuring agreement covers liability "because of injury to or destruction of property, including the loss of use thereof, caused by an occurrence." |

| INSURER & POLICY NUMBER | PROPERTY DAMAGE DEFINITION |
|---|---|
| **Continental Casualty RDU 9910226** <br> **American Home CE35–86–09** | The term "Property Damage", whenever used herein, shall mean direct or consequential damage to or destruction of tangible property including the loss of use thereof. 2 |
| **Lloyd's 739/A22584** <br> **Lloyd's DN604208** <br> *Lloyd's DN604209* <br> *Lloyd's DN604210* <br> *Lloyd's DN604211* <br> *Lloyd's CU 6002* <br> *Lloyd's CU 6006* <br> *Lloyd's CU 6003* | The term "Property Damage" wherever used herein, shall mean the loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured). 3 |
| *National Union 1189777* <br> *National Union 1189778* <br> *First State 924634* <br> *First State 924635* | "Property Damage" shall mean loss of or direct damage to or destruction of tangible property (other than property owned by any insured) and which results in an Occurrence during the policy period. 4 |
| **Transportation CCP904–40–44** <br> *Continental Casualty RDX 893–79–25* <br> **Transportation CCP995–43–08** <br> *Continental Casualty RDX 893–74–17* <br> **Transportation CCP248–30–85** <br> *Continental Casualty RDX 177–84–94* | "property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed providing such loss of use is caused by an occurrence during the policy period. 5 |
| *First State 925783* <br> *First State 925784* <br> *Columbia Casualty RDX 416–93–97* <br> *Lloyd's 614/NC6080* <br> *American Excess EUL 5002620* | [The term "Property Damage" is defined in the insuring agreement.] Property Damage Liability. For damages, because of physical injury to or destruction of or loss of tangible property caused by an occurrence. 6 |
| *Continental SRX 215–34–36* <br> *Continental SRX 319–68–11* <br> *Continental SRX 319–69–95* <br> *Continental SRX 189–14–12* | (k) "Property Damage" means (1) physical injury to or destruction of tangible property including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed, provided such loss of use is caused by an occurrence during the policy period. 7 |

KEY:

**BOLD** = "Property damage" definition found within this policy.
*ITALICIZED* = Follows form of underlying policy.
***BOLD/ITALIC*** = "Property damage" definition found within this policy. Policy also follows form to underlying policy.

## DEBTORS' EXHIBIT 391

### INSURER & POLICY NUMBER

**Group A:**

FIRST STATE 928157
NATIONAL UNION
 1226411
LLOYD'S 614/NC8106
AMERICAN EXCESS
 EUL 5003854
FIRST STATE 928158

**Group B:**

EMPLOYERS/WAUSAU
 5731-00-300103
LEXINGTON 55-40-631
LLOYD'S 614/NTA234
FIRST STATE 930326
TRANSIT SCU 955684
EMPLOYERS/WAUSAU
 5731-00-300113
NATIONAL UNION
 1226062
LLOYD'S 614/NTA235
AMERICAN EXCESS
 EUL5075895

**Group C:**

EMPLOYERS/WAUSAU
 5732-00-300103
LEXINGTON 5570052
LLOYD'S 614/NTA700
FIRST STATE 932702
TRANSIT SCU956 054
NATIONAL UNION
 118 5371
LLOYD'S 614/NTA 701
NATIONAL UNION
 1185372
AMERICAN EXCESS
 EUL 5084796
MIDLAND XL724609
HIGHLANDS SR40746
OLD REPUBLIC OXZ
 11573
NATIONAL SURETY
 XLX-148-24-29

**Group D:**

EMPLOYERS/WAUSAU
 5733-00-300103
FIRST STATE 933188
TRANSIT SCU95633
HIGHLANDS SR 40905
NATIONAL UNION
 9602859
LLOYD'S 614/NTB082
MIDLAND XL739171
AMERICAN EXCESS EUL
 5097481
LEXINGTON 5524913
AIU 75101718
CALIFORNIA UNION ZCX
 00 63 71
EMPLOYERS MUTUAL
 MMMW 72069
PROTECTIVE NATIONAL
 XUB 180-70-09
CENTRAL NATIONAL
 CNZOO-80-94
INTEGRITY XL 50 01 78
TWIN CITY TXS 101244
FEDERAL 7936-52-23
GRANITE STATE 6-682-
 3764
INA XCP 143929
HARTFORD 83 XS 102629
NATIONAL SURETY XLX
 148-25-93

**Group E:**

EMPLOYERS/WAUSAU
 5734-00-300103
FIRST STATE EU 000 580
TRANSIT SCU 956609
HIGHLANDS SR 41122
NATIONAL UNION
 9605640
LLOYD'S 614/NTB522
MIDLAND XL 739261
AIU 75-103564
ROYAL ED 102143
EMPLOYERS MUTUAL
 MMMW-72120
PROTECTIVE NATIONAL
 XUB 180-70-47
CENTRAL NATIONAL
 CNZOO-8431
INTEGRITY XL 50 01 78
TWIN CITY TXS 101244
GRANITE STATE
 6683-4163
INA XCP 155830
HARTFORD 83 XS 103453
NATIONAL SURETY XLX-
 153-01-19

### PROPERTY DAMAGE DEFINITION

"Property damage" means physical injury to, destruction of or loss of use of tangible property.

[Definition as it appears in the Umbrella policies to which these policies follow form:

 Group A) U.S. Fire 5230758627;
 Group B) International 5230718118;
 Group C) International 523 1254329;
 Group D) International 523-252321 (10/01/82—10/01/83); and
 Group E) International 523-252321 (10/01/83—10/01/84).]